former corporation. Their right to the rents, or over-riding royalties, they retained as individuals. To be sure, their interest in these royalties was in proportion to their ownership of the stock of the respective corporations, but that would have been true if the sublease had been to a stranger operator. That was the proportion in which they owned the old corporation and its assets, including the lease.

Their rights as individuals to the over-riding royalties were not tied to their stockholdings in the new corporation. There was no covenant that they must be transferred together. Within a comparatively short time after the arrangement was made, 50 percent of the stock of the new corporation passed, by normal devolution, to persons other than the owners of the over-riding royalties.

I think that royalty payments not in fact made to stockholders, or made to stockholders not as such but only because they happen to continue to own the right to the royalty payments, are not the substantial equivalent of dividends. If the separation, which was 50 percent complete in the tax years in question, later became 100 percent complete, and the only payments which the corporation could afford to make were the royalty payments to non-stockholders, it would be hard indeed to regard the payments as dividends.

Parties may put a transaction through two steps instead of one for the sole purpose of making it non-taxable, or less taxable, although, apart from the tax question, the form which they give the transaction would be a waste of time and paper and ink. United States v. Cumberland Public Service Co., 338 U.S. 451, 70 S.Ct. 280, 94 L.Ed. 251, affirming 83 F.Supp. 843, 113 Ct.Cl. 460.

In the instant case, the arrangement adopted had, as is said in the opinion of the court the purpose of assuring a more definite income to some of the then principal stockholders, in addition to the purpose of reducing taxes. The arrangement also made permanent and important changes in the relations to the corporation of the persons who were, as individuals, to receive the royalty payments. The company became unconditionally liable to make these payments, whether it made money on its mining operations or not, and whether the persons owning the royalty rights were stockholders or not.

The transaction was, I think, much more than the sham which it is called in the opinion of the court. I would allow the plaintiff to recover.

WHITAKER, J., concurs in the foregoing dissent.

ROSS ENGINEERING COMPANY
v.
The UNITED STATES.
No. 48680.
United States Court of Claims.
Jan. 11, 1955.

J. Roy Thompson, Jr., Washington, D. C., Bernard J. Gallagher, Washington, D. C., on the briefs, for plaintiff.

John R. Franklin, Washington, D. C., Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LITTLETON, Judge.

Plaintiff sues to recover $63,185.97 representing extra labor costs incurred in the performance of a lump-sum construction contract entered into with defendant through the Federal Public Housing Authority on June 23, 1944, for the construction of war housing facilities in Baltimore, Maryland. The increased costs resulted from payment by plaintiff to several crafts working on the project of higher wage rates than the rates contained in the contract specifications.

The Invitation for Bids called the bidder's attention to the fact that the wage rates specified in the contract documents were the maximum as well as the minimum wage rates which might be paid on the project. Paragraph 6 of the specifications contained a schedule of wage rates for the various laborers and mechanics to be employed on the project as determined by the Secretary of Labor to be prevailing for that area, in accordance with the provisions of the Davis-Bacon Act.[1] Subsection (d) of paragraph 6 provided that such rates were, by virtue of Executive Order 9250, the maximum as well as the minimum rates; that such rates were subject, however, to adjustment in accordance with the provisions of the Wage Stabilization Agreement of May 22, 1942 (to which the contracting agency was a party), Administrative Order No. 101 of the Secretary of Labor, and Supplement 1 thereto, and in accordance with all the rules and regulations of the National War Labor Board, particularly General Order 13A. The subsection also provided that while requests for wage adjustment might be made by either the union or the contractor, any increase granted as a result of such requests would not give rise to any claim on the part of the contractor for extra compensation from the Government, the contractor being required to pay whatever rate was permitted by law where the payment of such rate was necessary to complete the job expeditiously.

---

1. Act of August 30, 1935, 49 Stat. 1011, as amended by the Act of June 15, 1940, 54 Stat. 399, 40 U.S.C.A. §§ 276a to 276a–5.

Bids were advertised for in April 1944, and were opened on June 6, 1944; whereupon it was found that plaintiff was the low bidder. Between June 6 and 23, representatives of defendant and plaintiff negotiated concerning various items in plaintiff's bid and on June 23, 1944, the contract was awarded to plaintiff at a total price of $3,088,339.

Paragraph 3 of the Instructions to Bidders provided that each bidder should visit the site of the project and fully acquaint himself with conditions relating to construction and labor; that failure to do so would not relieve the bidder from any obligation with respect to his bid or to the contract, and that the submission of a bid would be taken by the Government as *prima facie* evidence that the bidder had complied with this section.

Work on the project commenced in July 1944. Shortly thereafter, plaintiff discovered that on and after August 1, 1944, it would have to pay carpenters 6¼ cents per hour more than the wage rate specified in the contract specifications, and that on and after October 1, 1944, it would have to pay lathers and plasterers 22½ cents per hour more than the contract specifications called for.

All three wage increases were the result of decisions of the Wage Adjustment Board for the Building and Construction Industry, U. S. Department of Labor. In the cases involving the plasterers and lathers, the requests for wage adjustment were made jointly by the Baltimore local craft unions and the Employing Plasterers Association of Baltimore. The applications to the Wage Adjustment Board for wage adjustments requested increases for plasterers and lathers from the rate of $1.50 per hour to $1.75 per hour, which latter rate was the rate contained in recent collective bargaining agreements entered into by the parties mentioned above. Both applications requested that the increase authorized by the Board be made effective October 1, 1944, in accordance with the terms of the bargaining agreements.

On May 25, 1944, the Wage Adjustment Board issued a decision authorizing an increase to $1.72½ effective October 1, 1944, for plasterers on all construction work in the Baltimore area. On August 16, 1944, the Board issued a decision authorizing the same rate and under the same conditions for lathers.

The application for an increased rate for carpenters was apparently made by the carpenters' union alone, and the record indicates that the Baltimore building contractors must have had serious objections to the granting of this increase since the United States Conciliation Service was, at least unofficially, called into the case in April 1944, by the Executive Secretary of the Wage Adjustment Board. Apparently conciliation efforts were successful, and the union and the Baltimore Chapter of the Associated General Contractors entered into a collective bargaining agreement on June 2, 1944, providing that the employers would pay the carpenters $1.43¾ per hour effective August 1, 1944. Accordingly, on June 21, 1944, the Wage Adjustment Board issued its decision authorizing an increase in the rate for carpenters on all construction in the Baltimore area from $1.37½ to $1.43¾ per hour, effective August 1, 1944.

When plaintiff became informed with reference to the increased wage rate for carpenters authorized by the Board for all work in the Baltimore area, it supposed that its contract, which, as stated, set forth minimum and maximum wage rates, precluded it from paying the increased rate approved by the Wage Adjustment Board and it asked the contracting agency for instructions. Plaintiff also advised the contracting officer that if it did have to pay the increased rates, it desired to make claim on the Government for additional compensation on account of such increases.

On September 6, 1944, defendant's construction supervisor wrote to plaintiff advising that under the terms of paragraph 6(d) (2) of the contract specifications, as amended, no claims for extra compensation could be based upon increased wages granted at the request of the contractor or the union. As to whether plaintiff could lawfully pay the increased rate, the letter contained the following statement:

" * * * the interim of [sic] decision [of the Wage Adjustment Board] has the force of law and it is the contractor's authority for posting the changed wage rate."

Plaintiff concedes that it could not have obtained the skilled laborers necessary to carry on the job without paying the increased rates authorized by the Wage Adjustment Board for carpenters, plasterers, and lathers, and also for numerous other trades which later obtained wage increases from the Board. Plaintiff's requests for reimbursement for such increases were all denied by the contracting agency.

Plaintiff contends that it is entitled to be reimbursed for the increased costs resulting from the wage increases authorized by the Wage Adjustment Board for several reasons. First, plaintiff urges that the letter of September 6, 1944, from defendant's construction supervisor, amounted to a "directive order" from an authorized agent of defendant to plaintiff that the increases would have to be paid. Plaintiff concludes that it is accordingly entitled to recover the extra costs occasioned by its compliance with this directive order, on the authority of this court's decisions in A. J. Paretta Contracting Co. v. United States, 109 Ct.Cl. 324, Sunswick Corp. v. United States, 75 F.Supp. 221, 109 Ct.Cl. 772, certiorari denied 334 U.S. 827, 68 S.Ct. 1337, 92 L.Ed. 1755, and Poirier & McLane Corporation v. United States, 120 F.Supp. 209, 128 Ct.Cl. 117.

The Poirier case is not apposite inasmuch as it did not involve a directive order either on the part of the Wage Adjustment Board or the contracting agency, but rather a retroactive change by the Secretary of Labor in his earlier decision as to wage rates. The Sunswick case did involve a directive order issued by the Wage Adjustment Board in a wage dispute. In the instant case no such directive order was issued to plaintiff by the Board in connection with any of the increases in question. In the Paretta case defendant's contracting officer issued an order to the contractor to pay an increased rate. In the instant case we do not think an order such as would create a liability on the defendant for the increased wages was issued to plaintiff. The letter of September 6, 1944, supra, on which plaintiff relies, was in response to plaintiff's inquiry regarding the problem of whether or not it could lawfully pay the increased rate authorized by the Board for carpenters in the Baltimore area, in view of the fact that its contract provided that the only rates that could be paid by plaintiff on this job were the rates set forth in the contract specifications. By its terms, the letter did not order plaintiff to pay the increased rate but merely advised plaintiff that the interim decision of the Wage Adjustment Board made it lawful for plaintiff to pay such rate and was plaintiff's authority for posting the changed rate on the job. Although the testimony as to what the writer of that letter meant to convey to plaintiff is somewhat unsatisfactory, we have found that he intended to advise plaintiff in substance, that since the Wage Adjustment Board had authorized the wage increase, plaintiff could lawfully pay it.

Inasmuch as plaintiff was not ordered by defendant to pay the increased rates and it paid them voluntarily in order to secure labor necessary to man the project, neither the Sunswick nor the Paretta cases supports plaintiff's claim.

Plaintiff next contends that because defendant's officers knew, prior to the date of the contract award on June 23, 1944, that the Wage Adjustment Board had granted increases effective at later dates to carpenters and plasterers, and also knew that a request for a wage increase was pending for lathers, defendant was under a duty to advise plaintiff of these facts during the contract negotiations, and that its failure to do so amounted to a misrepresentation of material facts. Plaintiff further says, that if defendant did not know of the Wage Adjustment Board decision of May 25, 1944, for plasterers, and the June 21, 1944, decision for carpenters, then there was a mutual mistake of fact and the contract signed on

June 23, 1944, did not reflect the true intent of the parties to the transaction and should be reformed by the court.

█ We think that neither of the above contentions is sound. Defendant undoubtedly knew that the three crafts had requested wage adjustments. Defendant was also probably notified when the Wage Adjustment Board entered decisions granting the increases. As stated in finding 11, the regular mailing list of the Wage Adjustment Board to whom notices of the Board's proceedings were sent, must have included the various government agencies engaged in contracting for building construction. However, at the time of the contract negotiations between June 6 and June 23, and when the contract was signed on June 23, the wage rates included in the contract specifications were in fact the rates prevailing and being paid in the Baltimore area and those specifications could not have been changed at that time since the increases granted by the Board were not to go into effect until some time after the contract was signed.

Although it might have been considerate of defendant's representatives to have advised plaintiff that the Wage Adjustment Board had granted prospective increases to plasterers (October 1, 1944) and carpenters (August 1, 1944), and that a wage increase was under Board consideration for lathers, we do not think that defendant was under any obligation to do so. On the other hand, we think that defendant would have been justified in assuming, as it probably did, that plaintiff, prior to bidding on the job, would have discovered these facts in the course of its investigation of labor conditions in the Baltimore area. The application for the carpenters' wage increase appears to have been filed with the Board prior to the date defendant advertised for bids. The application for the plasterers' increase was signed by the local union and by the employers' association in Baltimore on March 29, 1944, and by the plasterers' International Union, and by the Building and Construction Trades Department, American Federation of Labor, in Washington on April 6 and 7, re-spectively. It was received by the Board on April 8. The lathers' application was signed by the union and by the employers' association on May 11, and received by the Board on May 26.

The bids were not opened until June 6. Plaintiff admits that it did not inquire of any union officials either in Baltimore or in Washington concerning the wage situation in the Baltimore area. Plaintiff was not a Baltimore firm and did not belong to any of the employers' associations in that city. It did not make inquiry of those organizations concerning the wage situation. Plaintiff's principal office was in Washington, D. C., and yet plaintiff did not make inquiry at the offices of the Building and Construction Trades Department of the American Federation of Labor in Washington, nor at the office of the Associated General Contractors. The Wage Adjustment Board for the Building and Construction Industry was located in the Department of Labor in Washington and had been in operation for nearly two years at the time this contract was advertised. Plaintiff did not inquire at that office. The international unions of the various building trades had offices in Washington, and officials of those unions usually sign applications for wage increases made by local members. Plaintiff did not inquire at the offices of any of the international unions. In view of the contract provisions with reference to the non-liability of the Government for wage increases such as are here involved, it would seem that plaintiff was not diligent in its investigation concerning the matter of wage rates for labor in the Baltimore area.

Plaintiff employed only union labor on this project, the contract price of which was in excess of $3,000,000. It appears to us that plaintiff's investigation of labor conditions in the Baltimore area prior to making its bid was inadequate. A superficial check of the most obvious sources of information would have revealed that carpenters, plasterers and lathers were requesting wage increases; that neither the lathers nor plasterers had received any of the increase they

might be entitled to under the so-called Little Steel Formula, and that the carpenters had received only part of that increase. With that knowledge, plaintiff would have been justified in making an allowance in its bid to cover the additional cost which would be incurred when the requested increases went into effect, since the circumstances surrounding the applications indicated that the requests would be granted almost in full. In our opinion plaintiff's failure to include in its bid an amount sufficient to protect it against these increases was the direct result of its failure to comply with paragraph 3 of the Instructions to Bidders. Plaintiff is in no position to complain that the Government did not advise it of facts which plaintiff was at least, under an obligation to attempt to determine for itself, and which it could in fact have discovered with the minimum of effort.

We cannot agree with defendant that the Federal Public Housing Authority had no knowledge of the pending applications for wage adjustments or of the interim decisions of the Wage Adjustment Board when they issued. However, we do not think that this knowledge on the part of the contracting agency relieved plaintiff of its obligation to make a proper investigation of labor conditions and we think that if plaintiff had made such an investigation it would have been fully informed concerning the applications for carpenters, plasterers and lathers. Under the terms of the contract and the facts and circumstances of the case, defendant's representatives would have been justified in assuming the plaintiff had made such an investigation and was aware of the existence of such applications when the contract was negotiated.

After work on the contract began and throughout the course of the contract performance, the Wage Adjustment Board issued decisions authorizing increases for a number of the crafts employed by plaintiff or its subcontractors on the project in Baltimore. Some of the decisions were permissive only, while others took the form of directive orders. The directive orders, however, were directed to the Baltimore Chapter of the Associated General Contractors and since plaintiff was not a member of that organization, it was not compelled to obey such orders.

Plaintiff's contract specifically called attention to the fact that the wage rates specified therein were subject to adjustment under the General Orders of the National War Labor Board. The contract also provided that the contractor would be required to pay whatever rates were *permitted by law* and required to be paid in order that the job be completed expeditiously. The increased rates of which plaintiff complains were *permitted* by law, as defendant's construction supervisor advised plaintiff on September 6, 1944, and were required to be paid in order to complete the job expeditiously.

Under the terms of the contract and the facts and circumstances in this case, we are of the opinion that plaintiff is not entitled to recover and the petition is therefore dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN and WHITAKER, Judges, concur.

---

**GAY STREET CORPORATION OF BALTIMORE, MARYLAND,**

v.

**The UNITED STATES.**

**Congressional No. 3–52.**

United States Court of Claims.

Jan. 11, 1955.

