Larry FOWLER d/b/a Star Construction Company, Appellant,

v.

CITY OF ANCHORAGE, Appellee.

No. 3586.

Supreme Court of Alaska.

Aug. 28, 1978.

James T. Brennan, Rice, Hoppner & Hedland, Anchorage, for appellant.

Julie Garfield, Legal Consultant, Richard A. Weinig, Asst. Municipal Atty., Richard W. Garnett III, Municipal Atty., Anchorage, for appellee.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

RABINOWITZ, Justice.

Larry Fowler, a contractor, bid on and was awarded a public construction contract with the City of Anchorage. Between the time the invitation for bids was published and the time the contract was let, a change occurred in the minimum wage regulations for public contracts as provided by the Alaska Department of Labor. Thus, Fowler was required to pay $5,238.10 more in wages than he had planned to pay, based upon the earlier minimum wage figures. He filed a complaint against the city for this amount. The city was granted summary judgment, from which Fowler brings this appeal.

On June 28, 1974, the City of Anchorage published Invitation to Bid 74–C31 for a contract involving the construction of certain improvements in the Anchorage water system. This invitation included, among its specifications, a detailed schedule of prevailing wages for various classes of laborers. This schedule was a copy of the one issued by the Alaska Department of Labor on January 1, 1974. By mandate of AS 36.05.010, contractors performing work under public construction contracts are required to pay not less than the rates set forth in the current prevailing wage schedule. AS 36.05.070 requires that advertised specifications for public contracts of this type include a provision stating the minimum wages to be paid.

Three days later, on July 1, 1974, the Alaska Department of Labor issued a new

schedule. It appears that this new schedule did not come to the immediate attention of either the City of Anchorage or Fowler. On July 9, the city issued an amendment to its previously published specifications which did not include any notification to potential contractors that a new wage scale was in effect. After the bidding was closed, the city awarded the contract to Fowler. The contract was formally executed on July 28. Shortly after the contract was executed, Fowler learned that a new wage scale existed and that he was required to pay his employees accordingly. Fowler apparently had planned to pay his employees the minimum wages provided by the schedule which was attached to the invitation for bids; the subsequent change in schedules caused him to pay more than he had planned. Consequently, Fowler filed a formal claim with the city for the additional amount; and it was denied. Fowler then filed suit alleging that he was entitled to recover for the additional amount of wages he had been required to pay. He asserted three theories: the parties had entered into the contract under a mutual mistake; the city had negligently failed to amend the bid offer to reflect the new schedule; and the city had misrepresented the minimum wages which the contractor would be required to pay. The superior court granted summary judgment for the city and in doing so stated, in part:

A lot of [Fowler's] argument, I think, would require me to take an equitable position in aid of the non-union contractor to allow him a lower standard of

awareness than that which I think is required under the law and would, by that mechanism, engraft on the city certain duties which I do not think that the law does.

Fowler appeals from the superior court's grant of summary judgment to the City of Anchorage.[1]

On appeal, Fowler contends that he should have been granted relief on one of the three theories mentioned above. We turn first to the two tort theories advanced by Fowler: negligence and misrepresentation.[2] He contends that AS 36.05.070 establishes a statutory duty requiring the governmental entity inviting bids to publish correctly the prevailing wages. AS 36.05.-070(a) provides, in part:

The advertised specifications for a public construction contract exceeding $2,000 to which the state or a political subdivision of the state is a party which requires or involves the employment of mechanics, laborers, or field surveyors shall contain a provision stating the minimum wages to be paid various classes of laborers, mechanics, or field surveyors. . . .

The minimum wages to be paid, although not specified in this statute, are the prevailing wages. This is set forth in AS 36.05.-010, which provided at the time of this action:

*Wage rates on public construction.* A contractor or subcontractor who performs work on public construction in the state, as defined by AS 36.95.010(3), shall pay not less than the prevailing rate of wages

---

1. Since the timing of events is of significance, a summary chronology of the relevant dates follows:

   January 1, 1974—Alaska Department of Labor published a minimum wage schedule

   June 28, 1974—City of Anchorage announced intent to contract and made available all contract documents (including among its advertised specifications the January 1, 1974, minimum wage schedule)

   July 1, 1974—Alaska Department of Labor published a new minimum wage schedule

   July 9, 1974—The city's advertised specifications were amended without reference to the new minimum wage schedule

   July 16, 1974—Fowler submitted his bid; bidding was closed

   July 23, 1974—The contract was let to Fowler d/b/a Star Construction Company

   July 29, 1974—The contract was executed

   Later in July or August—Fowler inquired for the first time about the new wage scale.

2. No claim of intentional misrepresentation was advanced by Fowler before either this court or the superior court. Further, the unrefuted affidavits of two city employees involved in administering the contract stated that the first they knew of the changes in the schedule was when Fowler informed them after the contract had been let.

for work of a similar nature in the region in which the work is done.[3]

The prevailing rates are determined by the Department of Labor which also decides whether a contractor has violated AS 36.-05.010.[4] Thus, the city as the contracting government entity meets the requirement of AS 36.05.070 by appending to its invitation to bid the most recent schedule of prevailing wages as published by the Department of Labor. In the case at bar, this was done. At the time the initial invitation to bid was published, the correct schedule was attached and the city was in compliance with AS 36.05.070(a). However, three days later the schedule was revised by the Department of Labor. Neither the city nor Fowler knew about the change until after the contract was let but before work was commenced. The rule that Fowler urges this court to establish is that the city, as contracting agent, has a duty to be aware of changes in the wage rates and to amend the schedule published in its invitation to bid.

The language of AS 36.05.070 is mandatory, not directory: "The advertised specifications . . . *shall contain* a provision . . . ." (emphasis added) Unless the context otherwise indicates, the use of the word "shall" denotes a mandatory intent.[5] Thus, it is clear that the city has a statutory duty to publish as part of its bid specifications the applicable minimum wage schedules. Before we can speak to the questions of whether this duty confers litigable rights on a contractor and whether the city had a duty to amend its specifications in the present circumstances, we think it appropriate initially to consider what representations, if any, were made in the invitation to bid and in the contract which was awarded to Fowler.

The January 1, 1974 schedule of wages published by the Department of Labor was attached to both the invitation to bid and the contract. Specifically included in the contract was a clause stating that the attached schedule was made part of the contract, and this clause was initialled separately by Fowler.[6] The invitation to bid had also emphasized the effect of the schedule:

> Attention of bidders is particularly called to the requirements as to conditions of employment to be observed and minimum wage rates to be paid under the contract.

We note that both these clauses seek to limit the contract responsibilities of the parties and are not representations of the legal requirements which the contractor is bound to follow. In addition, the invitation to bid included as part of its information for bidders, the following statement:

> Each bidder must inform himself fully of the conditions relating to the construction of the project and the employment of labor thereon. Failure to do so will not relieve a successful bidder of his obligation to furnish all material and labor necessary to carry out the provisions of this contract. Insofar as possible, the contractor, in carrying out his work, must employ such methods or means as will not cause any interruption of or interference with the work of any other contractor.

The January 1, 1974, wage schedule itself included the following disclaimer:

> The Department of Labor has the authority to determine the prevailing wage, and whether or not §§ 10–110 of this chapter are being violated.

---

**3.** AS 36.05.010, as amended in 1976, provides:

> *Wage rates on public construction.* A contractor or subcontractor who performs work on public construction in the state, as defined by AS 36.95.010(3), shall pay not less than the current prevailing rate of wages for work of a similar nature in the region in which the work is done. The current prevailing rate of wages for each pay period is that contained in the latest determination of prevailing rate of wages issued by the Department of Labor before the end of the pay period.

**4.** This is set forth in AS 36.05.030(a), which provides in part:

**5.** 1A C. Sands, Sutherland Statutory Construction § 25.04, at 301 (4th ed. 1972).

**6.** *Alterations*: The following changes were made on the agreement before it was signed by the parties:

> Laborers & Mechanics' Minimum Rates of Pay, State of Alaska, Department of Labor, Juneau, Alaska, have been incorporated in and do become a part of this Contract.

Changes in a wage classification may be made by the Commissioner upon receipt of sufficient evidence to show that a published rate does not represent the wage prevailing in the industry.

The disclaimer in the schedule appears from its wording to suggest the possibility of discreet changes rather than periodic revisions of the entire schedule.[7] Thus, the city's duties under AS 36.05.070(a) must be defined in light of statements in the agreement which tended to limit the required minimum wages to those provided by the contract's terms. At the same time, however, disclaimers in the agreement put Fowler on notice—to some extent, at least—that the schedule might be altered by the Department of Labor.

In arguing their positions regarding the city's duty under AS 36.05.070(a), Fowler and the city consider at length the applicability of federal case law interpreting the Davis-Bacon Act, 40 U.S.C. § 276a(a) (1970).[8] The wording of AS 36.05.070 is based upon 40 U.S.C. § 76a(a) (1970), which provides, in part:

> The advertised specifications for every contract in excess of $2,000, to which the United States . . . is a party, for construction, alteration, and/or repair, . . . of public buildings or public works of the United States . . . within the geographical limits of the States of the Union, . . . and which requires or involves the employment of mechanics and/or laborers shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics which shall be based upon the wages that will be determined by the Secretary of Labor to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the city, town, village, or other civil subdivision of the State, in which the work is to be performed . . . .

The city argues that federal case law is apposite to this court's construction of AS 36.05.070.

The leading case interpreting this section of the Davis-Bacon Act is *United States v. Binghamton Constr. Co.*, 347 U.S. 171, 74 S.Ct. 438, 98 L.Ed. 594 (1954). In *Binghamton*, the contractor made a similar claim for increased payment of wages. The wage schedule included in the contract was one provided by the Secretary of Labor after a request from the Corps of Engineers (the contracting agency). Binghamton subsequently was awarded a contract which provided that the contractor pay not less than the wages provided in the schedules included among the specifications for the contract. The union wages of workers involved in the contract increased after the schedule was published. Also, shortly before the invitations to bid were issued, the Secretary of Labor had furnished another government agency with a wage schedule for the same area that reflected higher prevailing wages. After being unable to find workers to work at the specified minimum in his contract due to the fact that prevailing wages were higher, the contractor had to pay higher wages for which he sought compensation on the theory that the schedule was an affirmative representation as to the prevailing wages in the area. After being denied relief, the contractor brought suit in the Court of Claims. The court specifically found that an investigation by the contractor would have revealed prevailing rates which were higher than those specified, but the court held that the contract inadvertently misrepresented the prevailing wage. The Supreme Court of the United States reversed, stating:

> The Act itself confers no litigable rights on a bidder for a Government construction contract. The language of the Act and its legislative history plainly

---

7. The Alaska Department of Labor publishes wage schedules periodically, at least twice each year. The publication dates just prior to the contract in the case at bar were July 1, 1972, October 1, 1972 (amendment), January 1, 1973, July 1, 1973, January 1, 1974, and July 1, 1974.

8. It is clear that chapter 5 of Title 36 of the Alaska Statutes was modelled after the federal Davis-Bacon Act. 17 Op. Alaska Att'y Gen. 2 (1961).

show that it was not enacted to benefit contractors, but rather to protect their employees from substandard earnings by fixing a floor under wages on Government projects. Congress sought to accomplish this result by directing the Secretary of Labor to determine, on the basis of prevailing rates in the locality, the appropriate minimum wages for each project. The correctness of the Secretary's determination is not open to attack on judicial review.[9]

Much of the city's refutation of Fowler's claim relies on the above language. The city suggests that, as in *Binghamton*, AS 36.05.070 does not confer on the contractor litigable rights and that this statute and all of Title 36, chapter 5 was enacted for the benefit of laborers and not for the benefit of contractors. The primary difference is that in *Binghamton* the contractor claimed the schedule had falsely represented the actual prevailing wages. In the case at bar, the claim is that the city failed to represent correctly the legal minimum Fowler was required to pay. However, in both *Binghamton* and the case at bar, the schedule as published and the provisions of the contract amounted only to a representation of the minimum the contractor would have to pay and is no guarantee that the contractor would not have to pay more. Fowler attempts to distinguish the federal law in that no federal provision is equivalent to AS 36.05.010 in requiring the contractor to pay the prevailing wage. Under the federal scheme, whatever is published in the specifications of the contract is all the contractor is legally obligated to pay.[10] Thus,

9. *United States v. Binghamton Constr. Co.*, 347 U.S. 171, 176–77, 74 S.Ct. 438, 441, 98 L.Ed. 594, 599 (1954) (footnotes omitted). The Supreme Court further observed:

The Court of Claims nevertheless awarded respondent damages on the ground that the Government, through the Corps of Engineers, had falsely represented the prevailing rates in the Elmira area. The short answer to this is that the Government made no such representation. Neither the contract nor the specifications refers to "prevailing" rates. The contract speaks only of "wage rates not less than those stated in the specifications." The specifications in turn speak only of "minimum wage rates applicable in the locality." The only reference to "prevailing" rates appears in the statute itself, which provides that the minimum wage rates are to be "based upon . . . the wages . . . determined by the Secretary of Labor to be prevailing." But this provision in the Act cannot convert the contractor's obligation to pay not less than the minimum into a Government representation that the contractor will not have to pay more. On its face, the Act is a minimum wage law designed for the benefit of construction workers. The Act does not authorize or contemplate any assurance to a successful bidder that the specified minima will in fact be the prevailing rates. Indeed, its requirement that the contractor pay "not less" than the specified minima presupposes the possibility that the contractor may have to pay higher rates. Under these circumstances, even assuming a representation by the Government as to the prevailing rate, respondent's reliance on the representation in computing its bid cannot be said to have been justified.

347 U.S. at 177–78, 74 S.Ct. at 442, 98 L.Ed. at 599–600 (footnotes omitted).

10. 40 U.S.C. § 276a(a) (1970) provides, in full:

The advertised specifications for every contract in excess of $2,000, to which the United States or the District of Columbia is a party, for construction, alteration, and/or repair, including painting and decorating, of public buildings or public works of the United States or the District of Columbia within the geographical limits of the States of the Union, or the District of Columbia, and which requires or involves the employment of mechanics and/or laborers shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics which shall be based upon the wages that will be determined by the Secretary of Labor to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the city, town, village, or other civil subdivision of the State, in which the work is to be performed, or in the District of Columbia if the work is to be performed there; and *every contract* based upon these specifications *shall contain a stipulation that the contractor or his subcontractor shall pay all mechanics and laborers* employed directly upon the site of the work, unconditionally and not less often than once a week, and without subsequent deduction or rebate on any account, *the full amounts* accrued at time of payment, *computed at wage rates not less than those stated in the advertised specifications*, regardless of any contractual relationship which may be alleged to exist between the contractor or subcontractor and such laborers and mechanics, and that the scale of

*Binghamton* and the other cases deal with a misrepresentation of the actual wages that prevail in a geographic area while in the case at bar the alleged misrepresentation is of the legal minimum wage required to be paid by the contractor. On the basis of the foregoing distinction, Fowler argues that while the language of AS 36.05.070 might be nearly identical to the federal statute the purpose of the Alaska statute is different. Fowler takes the position that the intent behind AS 36.05.070, while ultimately to benefit laborers by requiring contractors to pay prevailing minimum wages, is also to benefit all bidders on a contract by requiring the government entity properly to inform contractors of the applicable minimum wages. Invoking the principle of statutory construction that statutes must be construed, when possible, to avoid making any provision superfluous,[11] Fowler contends that a reading of the statute which fails to recognize a duty created for the benefit of the contractor would render AS 36.05.070 superfluous because it would be redundant when read with AS 36.05.010.[12]

■ Undeniably, at least part of the intent of AS 36.05.070 is to inform bidders of the minimum wage rates. On the other hand, we think the proper construction of AS 36.05.070, as it relates to the duties of the government entity, involves a balancing of hardships. There does not seem to be any special expertise needed or difficulty involved in requiring the contractor to determine the applicable minimum wage schedules. Although it is not explicit from the record, it appears that the July 1, 1974,

wage schedule was equally available to the contractor and to the contracting governmental entity. Further, there was no showing of any fraud on the part of the city; it did not know of the changes in rates and no representation was made in the contract that this was the legal rate which Fowler would be bound by state law to pay.[13] To hold that the city has a duty to amend its invitation to bid in the instant circumstances and that the contractor can reasonably rely on the representations by the city is potentially inequitable to other bidders. In this case two contractors, other than Fowler, bid on the contract. One contractor stated by affidavit that he had adjusted his bid because he knew an increase in wages was possible as a result of ongoing union contract negotiations. To allow recovery in this situation gives a party who knows of a change in rates the opportunity to bid lower and to force the governmental entity to indemnify him for the increased wage payments, thus taking advantage of the bidder who correctly computed the wages or allowed for increases.

■ On the basis of the foregoing, we conclude that Fowler has not made out a claim for relief based upon either negligence or misrepresentation against the City of Anchorage. Since neither party had knowledge of the change in the wage rates prior to the bidding on the contract and since the wage rates attached to the invitation to bid were correct when the invitation was published, we conclude that the city was not negligent and that reliance by the

wages to be paid shall be posted by the contractor in a prominent and easily accessible place at the site of the work; and the further stipulation that there may be withheld from the contractor so much of accrued payments as may be considered necessary by the contracting officer to pay to laborers and mechanics employed by the contractor or any subcontractor on the work the difference between the rates of wages required by the contract to be paid laborers and mechanics on the work and the rates of wages received by such laborers and mechanics and not refunded to the contractor, subcontractors, or their agents. (emphasis added)

11. *See* 2A C. Sands Sutherland Statutory Construction § 46.06, at 63 (4th ed. 1973).

12. For the text of AS 36.05.010, *see* note 3, *supra*.

13. Reliance by Fowler on the published wage rates appears unreasonable in light of the provisions included in the invitation to bid that require the contractor to know all conditions in relation to wages and also in view of the statement in the wage schedule that they are subject to change.

contractor on any wage representations in the contract was unreasonable.[14]

■ Fowler also contends that both parties to the contract were mistaken as to the wage rates Fowler would have to pay his laborers and that this mutual mistake entitled him to rescission. The doctrine of mutual mistake does not permit rescission when the contract has expressly allocated the risk of a particular occurrence to one party and such an event has occurred.[15] The instant situation reflects such an allocation of risk; the invitation to bid contained a notice stating that the bidder must inform himself of wage conditions, and we believe this provision amounts to an express requirement that the bidder bear the particular risk of mistake.

The city contends that *Ross Engineering Co. v. United States*, 127 F.Supp. 580, 582–83, 130 Ct.Cl. 368 (1955) is apposite. In *Ross Engineering*, the contract involved specifications under the federal Davis-Bacon Act. The schedule of wages was to serve as both maximum and minimum but was subject to a series of adjustments. The contract included both a general instruction to the bidder to inform himself of all the conditions surrounding employment (as in the case at bar), and a specific provision that any adjustments in the cost of labor would not result in adjustments to the contract price. A similar claim of mutual mistake was made and the Court of Claims concluded:

> In our opinion plaintiff's failure to include in its bid an amount sufficient to protect it against these increases was the

direct result of its failure to comply with paragraph 3 of the Instructions to Bidders.[16] Plaintiff is in no position to complain that the *Government did not advise it of facts which plaintiff was at least, under an obligation to attempt to determine for itself, and which it could in fact have discovered with the minimum of effort.*

We cannot agree with defendant that the Federal Public Housing Authority had no knowledge of the pending applications for wage adjustments or of the interim decisions of the Wage Adjustment Board when they issued. However, we do not think that this knowledge on the part of the contracting agency relieved plaintiff of its obligation to make a proper investigation of labor conditions and we think that if plaintiff had made such an investigation it would have been fully informed concerning the applications for carpenters, plasterers and lathers. Under the terms of the contract and the facts and circumstances of the case, defendant's representatives would have been justified in assuming the plaintiff had made such an investigation and was aware of the existence of such applications when the contract was negotiated.[17]

We think *Ross Engineering* is persuasive and its reasoning is controlling in the instant litigation. We thus conclude that Fowler failed to made out a case for rescission.

The superior court's grant of summary judgment to the City of Anchorage is Affirmed.

---

14. If there had been a showing of actual fraud on the part of the city or if the wage schedule had been incorrect when published with the invitation to bid, then a different result might be indicated.

In order to avoid similar problems in the future, the government's invitation to bid should contain language along the following lines:

The attached schedule of wages is current to the date this invitation is published. However, it may be changed at any time by the Department of Labor and the contractor is bound by the schedule in effect when the contract is let.

15. *See* 13 S. Williston, A Treatise on the Law of Contracts § 1543A (Jaeger ed. 1970); *see generally* 3 Corbin on Contracts § 598, at 584–92 (1960).

16. Paragraph 3 of the Instructions to Bidders stated that the bidder had a duty to inform himself of conditions relating to construction and labor; thus, it was similar to the statement in paragraph 7 of the Instructions to Bidders in the instant case.

17. *Ross Engineering Co. v. United States*, 127 F.Supp. 580, 585, 130 Ct.Cl. 368 (1955) (footnotes furnished) (emphasis added).