**MAT–SU/BLACKARD/STEPHAN & SONS, a joint venture, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. 5685.

Supreme Court of Alaska.

July 16, 1982.

---

**7.** See note 4 *supra*.

Raymond A. Nesbett, Anchorage, for appellant.

Susan Urig, Asst. Atty. Gen., Wilson L. Condon, Atty. Gen., Juneau, for appellee.

Before BURKE, C. J., and RABINO-WITZ, CONNOR, MATTHEWS and COMPTON, JJ.

## OPINION

PER CURIAM.

The appellant has appealed from an adverse decision of the superior court which is based on an order granting summary judgment to appellee. We affirm on the Memorandum of Decision of the superior court which, with minor editorial changes is as follows:

## I. FACTS[1]

Mat-Su/Blackard/Stephan & Sons (MBS) is a joint venture engaged in construction work. On December 1, 1977, in response to the bid invitation of the State, MBS submitted a bid for paving a section of Rabbit Creek Road in Anchorage. The standard specifications which accompanied the bid invitation and the contract later executed provided that the contractor was

---

1. The facts recited here are based upon review of the entire file and materials furnished by the parties. *Walker v. White*, 618 P.2d 561, 563 (Alaska 1980). All reasonable inferences from these materials have been drawn in favor of MBS, the non-moving party and against the State, the moving party. *Valkama v. Harris*, 575 P.2d 789, 790 (Alaska 1978). Where factual dispute exists, the non-moving party's version of the facts is assumed as correct. *B-E-C-K Constructors v. State*, 604 P.2d 578, 581 n.4 (Alaska 1979).

to furnish gravel and other materials [2] and was required to obtain the necessary permits [3] for removal of gravel.

MBS was the low bidder on the project by some $800,000. Immediately after the bid opening, William Hansen, MBS's representative at the bid opening, examined the competing bids and determined that MBS's low bid resulted from anticipated lower gravel costs of using a gravel pit (Spendlove source) near the paving project site.[4] Hansen told a State representative immediately after the bid opening that MBS based its bid on gravel from the Spendlove pit and that if there was any problem with gravel from that source, MBS intended to declare a mistake and attempt to withdraw the bid.

In the period following the bid opening, but prior to the contract award, MBS and the State conducted tests of the gravel in the Spendlove pit to insure that it would meet the quality specifications in the contract. The legal right to remove gravel from the pit was assumed by MBS [5] and this assumption was conveyed to the State.[6]

Also prior to the contract award, residents of the area adjacent to the Spendlove

2. Standard specification 106–1.02 at 4 provides: "If sources of materials are not indicated on the plans ... [the contractor] shall acquire the necessary rights to take materials from the sources and shall pay all costs related to obtaining and developing the source including any which may result from an increase in length of haul...."

Standard specification 203–2.05 provides: "... Unless otherwise designated in the contract the Contractor shall make his own arrangements for obtaining borrow [gravel] and shall pay all costs involved."

The contract executed between the parties incorporated the standard specifications and provides: "That the Contractor ... hereby covenants and agrees to furnish and deliver all the materials.... The Contractor hereby agrees to receive the prices set forth in the proposal as full compensation for furnishing all the materials ... which may be required in the prosecution and completion of the whole work...."

3. Standard specification 107–1.02 provides: "Permits, Licenses and Taxes. The Contractor shall procure all permits and licenses ... necessary and incidental to the due and lawful prosecution of the work."

4. Prior to submitting the bid, MBS entered into negotiations with Spendlove to assure access to the gravel pit. These negotiations resulted in a contract between MBS and Spendlove wherein Spendlove warranted the price and quality of the gravel and further warranted that he had the legal right to remove gravel.

MBS kept the contract with Spendlove a secret in order to gain a competitive advantage over other bidders for the Rabbit Creek paving project. The bids of these other bidders were based on obtaining gravel from more remote sites.

5. MBS met with the Anchorage Chief Zoning Inspector on several occasions prior to submission of its bid and received assurances that the Spendlove pit had "grandfather rights" to operate as a prior non-conforming use under the Anchorage zoning ordinance.

6. Dan Blackard, one of MBS's two project managers, testified in his deposition as follows:

Q. Do you definitely remember State personnel having any questions with regard to grandfather rights prior to award of contract?

A. I can't recall that they specifically asked about grandfather rights. I'm sure they asked about if it was perfectly legal to haul out of that pit. We explained to them that we had talked to the Municipal Zoning official and the powers to be. And they had said there was no doubt that that thing was legal. There was no question in our minds or in the State's mind or in our mind after we got through telling them that they did have grandfather rights, and this was confirmed later by letter.

Q. Well, what was it that led you to the conclusion that there was any question in the mind of State personnel that the pit had legal rights?

A. Well, when we discussed it and if they asked about it, we told them and they were satisfied that we had done everything we could to find out whether or not he had grandfather rights. We had gone to the only person who could know. That's basically what I base my statement on.

Hansen testified in his deposition: Okay. Well, we took a series of tests just after the bid. We took tests before the bid. The State took series of tests prior to [December 16, 1977]. We had a meeting with all the results of all these tests on the 16th. There was never any doubt in anybody's mind about the grandfather rights, it was not discussed, only as maybe a side deal about the restoration of the pit and this and that. It was not in our mind, nor the State's mind, that this grandfather rights was a problem. But there was a problem with the degradation of the material, and whether the material would meet specification.

pit learned of the plan to remove gravel and voiced their opposition to the State in a telegram. The State responded that the contractor had the duty to secure gravel, and suggested the matter be taken up with the contractor. The State notified the contractor about the residents' concern and the State's reply.

On December 27, 1977, the contract was awarded to MBS and on January 3, 1978, it was signed. The question of MBS's right to remove the Spendlove gravel was raised at the preconstruction meeting on January 11, 1978, at which time MBS assured the State the matter was being taken care of.[7]

In late January, the State requested that MBS provide proof of its right to remove gravel from the pit. MBS complied by obtaining two letters from the Municipality of Anchorage setting out the grandfather rights in the Spendlove pit.[8] Once the letter was obtained, the State authorized MBS to begin work on the project and 46,000 tons of gravel were removed. However, neighboring property owners appealed the determination that the Spendlove pit was a non-conforming use. The Zoning Board of Examiners and Appeals then denied the right to remove gravel from the Spendlove pit. This decision was upheld by the superior court.

As a result of the loss of the Spendlove pit, MBS was forced to haul gravel from a more remote source provided to it by the State and for which no royalty was charged. MBS sought unsuccessfully to modify the contract administratively to compensate it for the higher costs in transporting the gravel.[9] MBS then filed this action to obtain compensation for additional expenses incurred in the project resulting from the closure of the Spendlove pit, based on a variety of theories.[10] These theories will be discussed in turn.

## II. MUTUAL MISTAKE

MBS alleges first that the availability of the Spendlove source was a basic assumption of the parties at the time of contracting, and that the parties were mistaken in this assumption. Judicial relief from the provisions of a contract on the basis of mutual mistake is proper where there was a mistake of both parties at the time of contracting as to a basic assumption on which the contract was made; the mistake had a material effect on the agreed exchange of performances, and the party seeking relief did not bear the risk of the mistake.[11]

While MBS was mistaken as to the continued availability of the Spendlove source, MBS's theory of mutual mistake must fail because the contract of the parties expressly allocated to MBS the burden of

7. At the meeting Terry Fleming, an employee of the Department of Transportation, and Hansen had the following discussion:

> FLEMING: Just a couple of things. A conversation I overheard before the meeting indicated to me that you're already deep into the request for a zoning exception or whatever it is you need to clear your material source. What's the status of this?
> HANSEN: The pit that we are anticipating hauling out of does have grandfather rights and the people in that neighborhood are opposing the grandfather rights. They are trying to figure out some way to make us go away. So far they haven't got anything.
> FLEMING: By grandfather rights you mean the zoning ordinance does not apply to this particular place?
> HANSEN: Yes.
> FLEMING: Okay. In other words you are taking care of it.

8. These letters were obtained at the request of the State. Hansen testified in his deposition that it was the usual practice of the State to require contractors to obtain such assurances. The duty to obtain necessary licenses and permits was upon the contractor.

9. For purposes of this motion it is assumed this added cost raised a fact issue as to whether the contract became impracticable. *See* note 1 *supra.*

10. Mutual mistake as to the availability of the Spendlove source, frustration of purpose, impossibility, commercial impracticability, subsequent illegality and interference of a third party.

11. Restatement (Second) of Contracts § 152 (1981). *See generally* 3 A. Corbin, Corbin on Contracts § 598, at 584–592 (1960); 13 S. Williston, A Treatise on the Law of Contracts § 1543A, at 85 (Jaeger 3d ed. 1970).

providing materials. While at the time of contracting the State knew MBS intended to use the Spendlove source and had bid on the basis of using that source, nothing in the record suggests the State premised its acceptance of MBS's bid on use of the Spendlove source. Any gravel source meeting quality specifications would have been appropriate. The State was indifferent to the gravel source—that decision rested with MBS.[12]

In *Fowler v. City of Anchorage*, 583 P.2d 817 (Alaska 1978) a contractor sought reformation of a contract with the city. Between the time of the bid and the time of the contract award, the State's minimum wage rates rose, forcing the contractor to pay higher than anticipated wages. The court refused to find a mutual mistake, declaring:

> The doctrine of mutual mistake does not permit rescission when the contract has expressly allocated the risk of a particular occurrence to one party and such an event has occurred [footnote omitted]. The instant situation reflects such an allocation of risk; the invitation to bid contained a notice [stating] that the bidder must inform himself of wage conditions, and we believe this provision amounts to an express requirement that the bidder bear the particular risk of mistake.

583 P.2d at 824. In the instant case the allocation of the risk of providing materials is even more explicit than in *Fowler*, since the costs (and the risk) incident to increased length of gravel haul were placed on MBS.[13] MBS has failed to indicate any actions or representations by the State which would raise a genuine issue of material fact as to the allocation of the risk of obtaining gravel.[14]

### III. OTHER THEORIES

Extensive discussion of MBS's other theories of recovery is unnecessary because each theory requires, as a matter of law, that the risk making performance of the contract more burdensome was not allocated to the party claiming relief from the contract.

■ MBS's theory that the purpose of the contract was frustrated by the unavailability of the Spendlove source is without merit.[15] First, the risk of unavailability was placed on MBS. Second, while MBS may have felt it desirable to obtain gravel from the Spendlove source, it cannot be said that removal of Spendlove's gravel was the object or effect the parties intended in contracting. The object of the contract was to build a road, and this purpose was not frustrated.

■ MBS next contends that the unanticipated unavailability of the Spendlove source constituted a contingency which rendered performance commercially impracticable. Of course, it is not necessary that performance be literally impossible to claim

---

**12.** The fact that the State knew MBS intended to remove gravel from the Spendlove source does not, without more, show [that] use of the Spendlove source was an implied condition in the contract between the parties. For example, in *B–E–C–K Constructors v. State*, 604 P.2d 578, 583 (Alaska 1979), the court upheld summary judgment for the State where a bridge relied upon by the contractor for the construction of other structures collapsed, making the cost of performing greater. Despite the fact that the railroad bridge was mentioned in the plans and specifications, that the State knew the plaintiff intended to use the bridge to aid construction and that use of the old bridge was an assumption of the State, the court concluded from the contract documents that use of the old bridge was not part of the basis of the bargain between the parties.

**13.** *See* note 2 *supra.*

**14.** In argument and in its brief MBS recognizes that it had the duty to secure materials, but argues that it complied with this requirement by locating the Spendlove source. MBS argues that the duty was then discharged and that the subsequent unavailability of the Spendlove pit by reason of the zoning decision was not a risk allocated to MBS. This contention is unsupported. The performance required of MBS was not to locate a gravel source but to construct a road from materials furnished by MBS. The duty to obtain materials rested with MBS throughout the performance of the contract.

**15.** *See generally* Restatement (Second) of Contracts § 265 (1981) regarding the doctrine of frustration of purpose.

relief from contractual terms,[16] and completion of the contract is not a bar to recovery.[17] For purposes of this motion it is assumed that the closing of the Spendlove pit was unanticipated and that the higher cost of gravel made performance impracticable.

■ MBS argues that the motion for summary judgment should be denied on the basis of *Northern Corp. v. Chugach Electric Association*, 518 P.2d 76 (Alaska 1974) and *Merl F. Thomas Sons v. State*, 396 P.2d 76 (Alaska 1964). Neither case is helpful.

In *Northern Corp.* the contract between the parties provided that rocks would be transported across the surface of a frozen lake to a dam. After several unsuccessful attempts to move the rock over the ice, the contractor abandoned the contract. Recovery by the contractor of the costs of attempting to perform was based on the fact performance in the *manner specified* by the parties was impossible. Had the agreement of the parties in the instant case been that the contract would be performed with Spendlove gravel, then the case would be analogous. As noted, MBS has failed to show that use of Spendlove's gravel was other than a means unilaterally selected by it to perform the contract and meet its obligation to provide materials.

Similarly, in *Merl F. Thomas* the court found there was a genuine issue of material fact as to whether the contract contained an implied condition specifying performance by moving equipment over the frozen Susitna River. There was evidence that all bidders assumed the equipment would cross the river at this point over the ice, and but

for the State's delay in opening bids and awarding the contract the crossing could have been made. At least for purposes of summary judgment this presented a fact issue. In the instant case all other bidders bid out of more conventional gravel sources. More importantly, MBS has presented no evidence and none is in the record which raises a factual question whether use of Spendlove's gravel was a mutually specified method of performance, in light of the unambiguous contract language to the contrary.

■ MBS next contends that because removal of gravel from the Spendlove source became unlawful by virtue of the zoning decision, it is entitled to recovery. The doctrine of impossibility by virtue of supervening illegality is unavailable to MBS. First, the ban on removal of the Spendlove gravel was not the result of an enactment after the time of contracting, but rather was the application of pre-existing law to the activity. Thus there was no supervening illegality.[18] Secondly, as noted above, the risk of procuring necessary legal rights to obtain the gravel was placed on MBS by the contract.[19]

■ MBS's final theory, that performance was made impossible by action of a third party, the Municipality, adds nothing to the contention discussed immediately above and is similarly without merit.

Since there is no dispute as to any material fact, and since the State is entitled to judgment as a matter of law, summary judgment is granted.

---

16. *Northern Corp. v. Chugach Elec. Ass'n*, 518 P.2d 76, 80–81 (Alaska 1974); Restatement (Second) of Contracts § 261, Comment d (1981).

17. *See Dillon v. United States*, 156 F.Supp. 719 (Ct.Cl.1957); *See also Transatlantic Fin. Corp. v. United States*, 363 F.2d 312 (D.C.Cir.1966); *Aluminum Co. of Am. v. Essex Group, Inc.*, 499 F.Supp. 53 (W.D.Pa.1980).

18. *Hawkins v. First Fed. Sav. and Loan Ass'n*, 291 Ala. 257, 280 So.2d 93, 96 (1973).

19. "Ordinarily, when one contracts to render a performance for which a governmental license or permit is required, it is his duty to get the license or permit so that he can perform. The risk of inability to obtain it is on him; and its refusal by the government is no defense in a suit for breach of his contract." *Hawkins v. First Fed. Sav. and Loan Ass'n*, 291 Ala. 257, 280 So.2d 93, 97 (Ala.1973), *quoting* 6 A. Corbin, Corbin on Contracts § 1347, at 435 (1962); *See Security Sewage Equip. Co. v. McFerren*, 14 Ohio St.2d 251, 237 N.E.2d 898 (1968); Restatement (Second) of Contracts § 264, Illus. 3 (1981).