## CHICAGO AND NORTH WESTERN RAILROAD COMPANY, a corporation, Appellee,

### v.

## UNION PACKING COMPANY, a corporation, Appellant.

### No. 74–1591.

United States Court of Appeals, Eighth Circuit.

Submitted March 10, 1975.

Decided April 17, 1975.

Timothy J. McReynolds, Omaha, Neb., for appellant.

Andrew E. Grimm, Omaha, Neb., for appellee.

Before GIBSON, Chief Judge, CLARK, Associate Justice,* and LAY, Circuit Judge.

LAY, Circuit Judge.

Union Packing Company (hereafter Union) appeals from a judgment of the district court dismissing two counterclaims against the Chicago and North Western Railway Company (hereafter Railroad). 373 F.Supp. 734 (D.Neb.1974). The Railroad sued Union to collect $24,411.02 in freight charges. Union did not deny the validity of these charges but refused to pay them because of two claims for damages it had allegedly suffered at the hands of the Railroad with regard to previous shipments. The district court deducted the sum of $5,556.10, representing that portion of one claim which the Railroad conceded to be valid under the Carmack Amendment, 49 U.S.C. § 20(11), from the Railroad's claim and entered judgment against Un-

---

* The Honorable Tom C. Clark, Associate Justice, Retired, United States Supreme Court, sitting by designation.

ion in the sum of $18,854.92. We affirm the judgment of the district court.

*The First Counterclaim*

For some time prior to April 10, 1970, Union had been shipping fresh meat via the Railroad to Chicago pursuant to a valid tariff denominated "Plan 2." Under Plan 2, a so-called piggy-back plan, the Railroad furnished all transportation from Union's packing facility to the purchaser in Chicago, including pick-up from the railhead and delivery by truck. There was a flat rate for this entire service.

On April 10, 1970, the Railroad issued embargo number 17–70 and notified its shippers that it would be unable to provide cartage to Chicago under Plan 2 for an indefinite period of time because a teamster's strike in that city prevented it from providing the disembarking and delivery service. The Railroad agreed, however, at Union's request, to provide all but the last leg of the service for Union if Union would provide tractors to unload and deliver the trailers in Chicago. Pursuant to this agreement, Union sent 486 shipments of beef between April 11 and July 3, 1970. Union prepaid the entire freight charge required by Plan 2. They expended the additional sum of $24,450.51 leasing tractors in the Chicago area. The first counterclaim requested a set-off in this amount. The district court denied the claim on the theory that the lawful embargo prevented a suit for damages.

Notwithstanding the embargo, Union alleges three alternative theories of recovery: (1) that under the equitable principle of unjust enrichment the Railroad should not be able to retain money it did not earn; (2) that it is entitled to

an allowance under 49 U.S.C. § 15(13) for the fair value of the cartage service it rendered; and (3) that it is entitled to a reparation since the Railroad's tariff was unjust and unreasonable and resulted in an overage.

█ Union's contention under the equitable doctrine of unjust enrichment is easily laid to rest. It is well settled that "equitable considerations may not serve to justify [the] failure of [a] carrier to collect, or retention by [the] shipper of, any part of lawful tariff charges." Baldwin v. Scott County Milling Co., 307 U.S. 478, 485, 59 S.Ct. 943, 948, 83 L.Ed. 1409 (1939).

We turn to Union's claim that it is entitled to an *allowance* under 49 U.S.C. § 15(13)[1] for the reasonable value of the tariff services it, and not the carrier, supplied.

█ There is no doubt that the pick-up and delivery service performed in Chicago by tractors hired by Union was a service included in the Railroad's tariff and, therefore, a service which the Railroad absent an embargo was obligated to perform. The parties stipulated to this effect. Since Plan 2 admittedly made no provision for allowance, the only obstacle preventing recovery of an allowance in this instance is the requirement in § 15(13) that "the charge and allowance therefor shall be published in tariffs or schedules filed . . . ." That obstacle is insurmountable here, however, for the requirement of publication is rigid, and to be eligible for an allowance, a shipper must be shipping under a tariff which, by its terms, permits one. This court has clearly recognized this fact in an analogous case. In United States v. Kansas City Southern Ry. Co., 217 F.2d

---

1. Title 49 U.S.C. § 15(13) provides:

(13) If the owner of property transported under this chapter directly or indirectly renders any service connected with such transportation, or furnishes any instrumentality used therein, the charge and allowance therefor shall be published in tariffs or schedules filed in the manner provided in this chapter and shall be no more than is just and reasonable, and the Commission

may, after hearing on a complaint or on its own initiative, determine what is a reasonable charge as the maximum to be paid by the carrier or carriers for the services so rendered or for the use of the instrumentality so furnished, and fix the same by appropriate order, which order shall have the same force and effect and be enforced in like manner as the orders above provided for under this section.

763 (8th Cir. 1955), the defendant's grain tariff for shipments to New Orleans included an elevating service but made no provision for an allowance if this service was not utilized. In refusing to award the allowance, this court said:

It must be remembered that the courts are not entitled to engage in any semblance of rate-making whatsoever, either indirect or direct, such as attempting to put a value as such, for any purpose, on any aspect of carrier service, which a tariff does not make legally clear. . . . The courts may do no more in respect to carrier rates or charges than to read tariffs and give them effect as a matter of law. Thus, they are not even at liberty to examine into and evaluate divergent or equivocal extrinsic facts as a basis for getting at the meaning or the application of the language of a tariff. (Citations omitted).

217 F.2d at 768.[2]

2. The publication requirement is the natural outgrowth of the very purpose of the Interstate Commerce Act. In discussing that purpose the Supreme Court early proclaimed:

That the act to regulate commerce was intended to afford an effective means for redressing the wrongs resulting from unjust discrimination and undue preference is undoubted. Indeed, it is not open to controversy that to provide for these subjects was among the principal purposes of the act. . . . *And it is apparent that the means by which these great purposes were to be accomplished was the placing upon all carriers the positive duty to establish schedules of reasonable rates which should have a uniform application to all, and which should not be departed from so long as the established schedule remained unaltered in the manner provided by law.* (Emphasis added).

Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 439, 27 S.Ct. 350, 355, 51 L.Ed. 553 (1907).

The unavoidable duty of the parties to observe a published tariff has been consistently reiterated by the Supreme Court. In Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 59 S.Ct. 612, 83 L.Ed. 953 (1939), the Court observed:

Until changed, tariffs bind both carriers and shippers with the force of law. Under Section 6 of the Interstate Commerce Act the carrier cannot deviate from the rate specified in the tariff for any service in connection with the transportation of property. That section forbids the carrier from giving

■ We think it clear that there can be no allowance under § 15(13) in this instance since Plan 2 did not provide for one.[3]

■ Union's final theory, that it should be allowed to recover the excess as an overage since the Railroad received more than a just and reasonable rate for what services it performed, is also untenable. It must fail because the courts lack the power to determine the reasonableness of any established tariff. As said in Lewis v. Southern Pacific Co., 283 U.S. 654, 51 S.Ct. 592, 75 L.Ed. 1333 (1931):

But no action for damages alleged to have been caused by the exaction of excessive rates for interstate transportation can be maintained in any court, state or federal, in the absence of a

a voluntary rebate in any shape or form. . . . Involuntary rebates from tariff rates should be viewed with the same disapproval as voluntary rebates.

306 U.S. at 520–21, 59 S.Ct. at 614. *See also* United States v. ICC, 352 U.S. 158, 77 S.Ct. 241, 1 L.Ed.2d 211 (1956).

3. While a court can do no more than apply the established rate, the ICC may provide for an allowance if requested. In General American Tank Car Corp. v. El Dorado Terminal Co., 308 U.S. 422, 60 S.Ct. 325, 84 L.Ed. 361 (1940), the Court said:

From what has been said it results that the shipper in this case was permitted by law to furnish freight cars for the transportation of its products and to be paid a reasonable allowance for performing this portion of the public service which the carrier was bound to render, and that the law requires that the amount and conditions of payment of such allowance shall be set forth in a published tariff. If this is not done, the shipper may complain to the Commission, to the end that a proper allowance be ascertained and made effective by a schedule duly published. In the present case this has not been done. Nor has the shipper ever applied to the Commission for its decision as to what was a proper allowance for the cars furnished by it.

*Id.* at 430, 60 S.Ct. at 330. *See also* United States v. ICC, 337 U.S. 426, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949).

prior finding by the Commission that the rate charged was unreasonable. 283 U.S. at 661, 51 S.Ct. at 595.[4]

There has been no such finding in this instance.

### The Second Counterclaim

Union's second counterclaim also concerns a shipment of fresh beef. This shipment, one carload, was accepted by the Railroad as initiating carrier for carriage to a consignee in Massachusetts. It was transferred at some point by the Railroad to another carrier, the Boston & Maine Railroad (B. & M.) for delivery to its destination. Upon tender to the consignee, the meat was found to be spoiled and the consignee refused to accept it. The B. & M. then sold the beef for salvage. Originally the meat had a fair market value of $15,145.21. The salvage sale brought $9,589.11. However, the B. & M. is now in reorganization proceedings and the proceeds of the salvage sale have been impounded by the bankruptcy court. The Railroad conceded its liability as initiating carrier for the amount of damage to the beef determined by the difference between the fair market value upon receipt and the proceeds of the salvage sale, or $5,556.10. Union asserts, however, that it is entitled to the entire $15,145.21, which includes not only the damage occurring during shipment but its subsequent loss caused by the B. & M. bankruptcy.

■ The district court found that any loss occurring after tender of the shipment to the consignee was not the responsibility of the initiating carrier under the Carmack Amendment. We agree. The Carmack Amendment was intended to bring about a uniform rule of responsibility for shipments passing in interstate commerce. *See* Atchison, T. & S. F. Ry. Co. v. Harold, 241 U.S. 371, 378, 36 S.Ct. 665, 60 L.Ed. 1050 (1916). This was to be achieved by rendering the initial carrier statutorily responsible for any damage incurred during the course of shipment. This, it was hoped, would facilitate the filing of valid damage claims and lead to the development of an integrated and dependable system of transportation throughout the country.

■ It is clear, however, that the initiating carrier's responsibility extends only to "the full actual loss, damage, . . . caused by" it. *See* Missouri Pacific R. Co. v. Elmore & Stahl, 377 U.S. 134, 137, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964). It is not an absolute insurer.

■ When, as here, a proper tender is made and improperly refused, the ini-

---

4. Judge Ridge, who was later to serve as a distinguished member of this court, wrote as the district judge in the *Kansas City Southern* case:

> It is well settled that the right to maintain an action at common law to recover the excess of a freight charge, over the duly published or established rate of a carrier is not affected by any of the provisions of the Interstate Commerce Act. Macon D. & S. R. Co. v. General Reduction Co., 5 Cir., 44 F.2d 499, certiorari denied 283 U.S. 821, 51 S.Ct. 345, 75 L.Ed. 1436. Likewise, the common-law right to recover the difference between the amount of a reasonable charge and the amount of an exorbitant unpublished charge coercively exacted by a carrier still remains; . . . *but,* if the charges of an interstate carrier have been made in accordance with filed and published rates, as provided in the Interstate Commerce Act, supra, the common-law remedy for enforcement of such a right has been abrogated, and enforcement of a claim under such circumstances is dependent upon the injured party's first filing a timely complaint with the Interstate Commerce Commission and obtaining a finding by that body that the rate charged was unreasonable under the circumstances, and the amount such party was thereby overcharged. . . . In a common-law action for recovery of damages, or overcharge, as the consequence of a published rate exacted by an interstate carrier, the only question between a shipper and the carrier is what is, or was, the legal published rate for the shipment, and not what the rate should have been, . . . and, this is so where the alleged damage or overcharge is due to an alleged practice of the carrier.
>
> United States v. Kansas City Southern Ry. Co., 116 F.Supp. 484, 487 (W.D.Mo.1953), vacated on other grounds, 217 F.2d 763 (8th Cir. 1955).

tiating carrier's liability for further damages under the Carmack Amendment terminates. Republic Carloading & Dist. Co. v. Missouri Pacific R. Co., 302 F.2d 381 (8th Cir. 1962). Dealing with a carrier's liability under § 20(11) in Fraser-Smith Co. v. Chicago, R. I. & P. R. Co., 435 F.2d 1396 (8th Cir. 1971), we observed:

> The law is well settled that where goods are shipped by common carrier and become damaged in transit, the consignee nevertheless has the duty to accept the shipment. Under such circumstances the consignee's obligation is not affected by the fact that the goods have been injured or damaged during transit, unless they are considered to be "totally worthless."

> . . . The proper measure of damage controlling in the instant case is the difference between the market value of the undamaged goods as shipped . . . and the reasonable market value of the damaged product *as delivered to the consignee* . . . . (Emphasis added).

*Id.* at 1399, 1402.

Thus, the rule is that damages under § 20(11) are determined at the time of the tender to the consignee and any diminution in value or loss incurred thereafter is not the responsibility of the carrier.

Applying these principles to the present case it is clear that the salvage sale and ensuing bankruptcy occurred after the consignee's wrongful refusal and thus the initiating carrier is relieved of any liability for losses incurred in connection with them. The district court's reasoning that upon the consignee's refusal to accept the goods the B. & M. became a warehouseman [5] and that the Railroad's liability as a carrier ceased at that time reaches the same result.

Judgment affirmed.

---

5. *See* General American Trans. Corp. v. Indiana Harbor Belt R. Co., 191 F.2d 865 (7th Cir. 1951).