[No. 2903-3.   Division Three.   June 14, 1979.]

ROGERS WALLA WALLA, INC., *Respondent,* v. WILLIS SHAW FROZEN EXPRESS, INC., *Appellant.*

ROE, J., dissents in part by separate opinion.

*Golden & Knowlton, John O. Knowlton, Hawley, Troxell, Ennis & Hawley,* and *Jess B. Hawley III,* for appellant.

*Williams & Golden* and *Robert J. Williams,* for respondent.

GREEN, C.J.—Rogers Walla Walla, Inc., brought this action against Willis Shaw Frozen Express, Inc., for damages resulting from the alleged negligence of the carrier in transporting an order of frozen potatoes. The trial court found for Rogers and awarded it $9,592.51.

Willis Shaw's appeal presents the following questions: (1) When the risk of loss for goods is upon the buyer, does a shipper have a cause of action against the carrier for negligence? (2) Does the Carmack amendment, 49 U.S.C. §

20(11) (1970), govern this transaction, and does that statute require a shipper to produce evidence that the goods had no substantial value when they reached their destination before it can recover from a carrier for negligence? and (3) Did the trial court properly award damages based upon the U.S.D.A. tests which took place after the potatoes were returned to Rogers? Rogers cross–appeals, seeking prejudgment interest.

Rogers Walla Walla is a manufacturer of frozen, processed foods. In September 1975, Glacier Sales, a food broker, placed an order with Rogers for a quantity of frozen potatoes for a buyer in Louisville, Kentucky. Rogers shipped the potatoes f.o.b. Pasco in one of Willis Shaw's trucks. The bill of lading recited that the potatoes were received by the carrier in externally good condition, and it directed Willis Shaw to maintain the load at a temperature of zero degrees while in transit. William Lawr, Rogers' operations manager, stated that the potatoes in question were of Grade A variety and had been stored at an average of 4 to 6 degrees below zero before they left the plant.

On September 8, the truck arrived in Louisville with its load of potatoes. However, the buyer refused to accept the goods. At trial, Darrel Benzel, distribution manager for Rogers, testified that he spoke by telephone with Walt Berkenbile, Willis Shaw's dispatcher in Boise, shortly after the buyer had rejected the shipment. Mr. Benzel stated that Mr. Berkenbile told him that the temperature at the top of the load was 38° and was 19° at the middle and at the bottom of the load. Willis Shaw placed the potatoes in cold storage in Cincinnati, Ohio, where they remained until the carrier returned them to Rogers 3 months later.

While the potatoes were stored in Cincinnati, Willis Shaw had them tested by a microbiologist for bacteria. The microbiologist did not testify at trial, but his test results were admitted. Willis Shaw presented the testimony of Dr. Robert Hibbs, professor of chemistry at Boise State University, for the purpose of explaining the test results. In Dr. Hibbs' opinion, the test indicated that the potatoes were 80

to 90 percent acceptable, *i.e.,* safe to consume, at the time the microbiologist tested the potatoes in early October. However, the potatoes were not graded for quality nor was the marketability of the potatoes determined while they were stored in Cincinnati.

Willis Shaw returned the potatoes to Rogers on December 12, 1975. Rogers immediately obtained a U.S.D.A. inspector to grade the returned product. He determined that the majority of the potatoes were substandard with heavy icing. Rogers ultimately salvaged only about 5 percent of the load. The trial court awarded Rogers damages equal to the difference between the market value of the potatoes as shipped and their salvage value, plus the cost of the U.S.D.A. testing.

■ First, Willis Shaw contends that Rogers has no cause of action against it for negligent transportation. It reasons that under the Uniform Commercial Code, RCW 62A.2–509(1)(a),[1] the risk of loss in transit passed to the buyer when Rogers delivered the goods to the carrier f.o.b. the place of shipment. Since the buyer's rejection was wrongful, Willis Shaw argues that Rogers is limited to its remedies against the buyer. We agree that in an action between Rogers and the buyer, the responsibility for the contract price may rest with the buyer. However, the action here is between Rogers and Willis Shaw. These parties are in privity of contract, and their contractual agreement is not affected by the risk of loss provisions of the code. The code itself recognizes the interests of a shipper in rejected goods. RCW 62A.2–401(4) provides:

> A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified, . . . revests title to the goods in the seller.

---

[1]RCW 62A.2–509(1)(a) provides:

"(1) Where the contract requires or authorizes the seller to ship the goods by carrier

"(a) if it does not require him to deliver them at a particular destination, the risk of loss passes to the buyer when the goods are duly delivered to the carrier even though the shipment is under reservation . . ."

Moreover, Rogers' direct action against the carrier has the advantage of avoiding an unnecessary suit. If Rogers proceeded against the buyer and recovered, the buyer, in turn, could bring an action against the carrier for the damages. In either event, Willis Shaw would be ultimately liable.

Second, Willis Shaw assigns error to the trial court's refusal to adopt its interpretation of the Carmack amendment, 49 U.S.C. § 20 (11),[2] and *Fraser–Smith Co. v. Chicago, Rock Island & Pac. R.R.,* 435 F.2d 1396 (8th Cir. 1971). According to Willis Shaw, *Fraser–Smith* holds that under the Carmack amendment the shipper must prove that the goods were without substantial value when they reached their destination before it can recover from the carrier. This interpretation of *Fraser–Smith* is too broad.

In *Fraser–Smith,* the shipper and the consignee were the same company. The consignee rejected the goods and left them in the possession of the carrier who was unable to dispose of the goods until 15 days later. When the plaintiff shipper attempted to measure its damages by subtracting the salvage value of the goods at the time they were sold by the carrier from the value of the goods when they were delivered to the carrier, the carrier objected. It argued that the goods were of the type that would continue to deteriorate unless salvaged immediately. It further claimed that it could not be held liable for deterioration occurring after the consignee's rejection because the consignee had a duty to accept the goods unless they were without substantial value. The appellate court agreed and held that, in those peculiar circumstances, the plaintiff had the burden of

---

[2]49 U.S.C. § 20(11) provides:

"Any common carrier . . . receiving property for transportation from a point in one State . . . to a point in another State . . . shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier . . . to which such property may be delivered or over whose line or lines such property may pass within the United States or within an adjacent foreign country . . . and no contract, receipt, rule, regulation, or other limitation of any character whatsoever shall exempt such common carrier . . . from the liability hereby imposed; . . ."

proving that the extent of the damage at the time of rejection was the same as at the time of salvage. It is understandable that when the shipper and the receiver are the same entity, the latter should be required to accept delivery unless the goods are substantially destroyed.

We do not have that situation in this case. Here, the shipper, Rogers, and the consignee are not the same entities. Moreover, the goods were frozen and, if maintained at the same temperature, they would not deteriorate. Application of the *Fraser–Smith* rule should be limited to situations involving goods which will deteriorate regardless of the carrier's exercise of due care following rejection and to those cases where the shipper and the consignee are the same entity and, thus, the shipper reasonably can be held responsible for the consignee's failure to accept the goods. This is the thrust of the cases relied upon in the *Fraser–Smith* decision.[3]

■ Under the Carmack amendment, which codifies the common law in the area of carrier liability,[4] the shipper establishes a prima facie case when it shows (1) that the shipment was in good condition when delivered to the carrier, and (2) that the goods were delivered in damaged condition. *L.E. Whitlock Truck Serv., Inc. v. Regal Drilling*

---

[3]*Sunset Motor Lines, Inc. v. Lu–Tex Packing Co.,* 256 F.2d 495 (5th Cir. 1958) (*shipper* ordinarily bound to accept redelivery of goods in damaged condition); *Strickland Transp. Co. v. American Distrib. Co.,* 198 F.2d 546 (5th Cir. 1952) (*shipper* had no right to reject property and recover its full value); *Biltmore Mfg. Co. v. Overnite Transp. Co.,* 157 F. Supp. 891 (W.D.N.C. 1958) (*consignee* not bound to accept goods where value of goods has been destroyed).

Willis Shaw also relies on *Chicago & Northwestern R.R. v. Union Packing Co.,* 514 F.2d 30 (8th Cir. 1975). That case simply held that any loss occurring after tender of the shipment to the consignee was not the responsibility of the *initiating* carrier under the Carmack amendment. Here, Willis Shaw was the delivering carrier as well as the initiating carrier. In addition, no evidence was produced which would indicate that the damage occurred after tender of shipment to the buyer.

[4]The Carmack amendment also permits a shipper to sue the *initial* carrier whether the damages occurred while the goods were in the hands of the initial carrier or the connecting carrier. This represents an expansion of the carrier's common–law liability. *L.E. Whitlock Truck Serv. v. Regal Drilling Co., supra.*

*Co.,* 333 F.2d 488, 491 (10th Cir. 1964). In the case of perishable goods, the burden then shifts to the carrier to prove its compliance with the shipper's instructions. *Larry's Sandwiches, Inc. v. Pacific Elec. Ry.,* 318 F.2d 690, 692–93 (9th Cir. 1963).

In the instant case, substantial evidence supports the trial court's findings that the potatoes were in good condition when delivered to Willis Shaw, but were damaged at the time of their arrival in Louisville, Kentucky. Dr. Hibbs' testimony concerning the absence of significant amounts of bacteria in the potatoes is not proof of their commercial quality or marketability. Since Willis Shaw took the position throughout the trial that Rogers had the burden of proving that the goods had no substantial value at the time of rejection and that the carrier was at fault, it produced no evidence that it had complied with Rogers' instructions that the shipping temperature of the potatoes be kept at zero degrees. On the other hand, Rogers presented the testimony of Mr. Benzel concerning his conversation with Mr. Berkenbile, which indicates that Willis Shaw did not follow those instructions. Therefore, the trial court's conclusion that the evidence sufficiently established Willis Shaw's liability must stand.

Third, Willis Shaw argues that Rogers failed to prove the extent of its damage at the time of the buyer's rejection. The trial court based its damage award on the U.S.D.A. test which graded the potatoes after Willis Shaw had returned them to Rogers. Because of the frozen nature of the product, there was no significant difference in the condition of the potatoes at the time of rejection and storage in Cincinnati and the time of their redelivery to Rogers.

Finally, we turn to Rogers' argument on its cross appeal. Rogers contends that the trial court should have awarded prejudgment interest on its damages. We agree. The rule is that interest is allowed as damages for the withholding of the amount due when that amount is liquidated, or, if unliquidated, the amount is ascertainable by

computation. *Mall Tool Co. v. Far West Equip. Co.,* 45 Wn.2d 158, 169, 273 P.2d 652 (1954); *Prier v. Refrigeration Eng'r Co.,* 74 Wn.2d 25, 32, 442 P.2d 621 (1968). Here, the amount due was ascertainable and is equal to the difference between the market value of the goods shipped, *i.e.,* the sale price, and the salvage value. As was stated in *Seattle v. Dyad Constr., Inc.,* 17 Wn. App. 501, 520, 565 P.2d 423 (1977), *review denied,* 91 Wn.2d 1007 (1978):

> The amount of loss could be definitely fixed from the facts proven. The existence of a dispute over part or all of a claim does not change that claim from a liquidated to an unliquidated one.

Therefore, we reverse the judgment of the trial court to the extent that it disallowed Rogers prejudgment interest at the statutory rate from the date of the salvage sale.

Affirmed in part and reversed in part.

MUNSON, J., concurs.

ROE, J. (concurring in part, dissenting in part)—I agree with the majority except I would not reverse the trial court in its denial of prejudgment interest. I do not think the salvage is liquidated because it is not established by mere computation or known standards. *Ryan v. Plath,* 20 Wn.2d 663, 148 P.2d 946 (1944), is in point. In *Ryan* the action involved the accounting of the proceeds of an apple crop. No prejudgment interest was allowed because the account was controverted as in the instant case, and the claim was not liquidated until proof was taken and the account approved by the trial court. There was reliance on opinion and discretion.

*Mall Tool Co. v. Far West Equip. Co.,* 45 Wn.2d 158, 273 P.2d 652 (1954), discussed *Ryan v. Plath, supra,* and stated the balance due defendants was on approval by the court of the manner of disposal of the apple crop. It also included the allowance of reasonable compensation for the administrator's services.

Here, the method of salvage was disputed and the amount realized from the sale of the potatoes was challenged. It depended on many factors, and whether it was the correct method of salvage rested upon the approval by the court.

Hence, I would affirm the trial court on all grounds.

Reconsideration denied July 11, 1979.