Edward A. MERDES, Appellant,
Cross-Appellee,

v.

Richard V. UNDERWOOD, d/b/a
Alaska Feed Company, Appellee,
Cross-Appellant.

Nos. S–1698, S–1717.

Supreme Court of Alaska.

Sept. 11, 1987.

D. Randall Ensminger, Fairbanks, for appellant, cross-appellee.

Lance C. Parrish, Fairbanks, Parrish Law Office, for appellee, cross-appellant.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

This is an appeal from a summary judgment granted to Richard V. Underwood against Edward A. Merdes based on an alleged agreement by Merdes to pay a debt owed by OHM, Inc. (OHM) to the Alaska Feed Company, an enterprise solely owned by Underwood. The principal issue is whether, as a matter of law, Merdes' actions and representations estop him from denying that he agreed to pay interest on the debt in question.

## I. BACKGROUND.

In about 1970, Merdes and his wife Norma, with Jim and Linda Harding, formed OHM, a subchapter S corporation, to operate a farming business in the Delta Junction area. The Merdes were 80% shareholders and the Hardings were 20% shareholders until 1981, when the Merdes obtained 100% ownership.

Underwood delivered $64,950.64 worth of seed to OHM in Delta in 1978. Merdes, on behalf of OHM, paid $5,000 down with the remaining balance due August 1, 1978. The balance was not paid and Merdes was contacted concerning this bill in October 1978. A series of letters were thereafter exchanged between Merdes and Underwood's counsel. Eventually, Merdes assumed personal responsibility for the debt. On January 29, 1980, Merdes had delivered to Underwood's counsel a memo that stated in part:

> Following through on your letter of January 8, regarding Alaska Feed--OHM debt [*] and our telephone conference last Friday, please consider this letter as my personal assurance that if the money due Alaska Feed is not paid from the proceeds of the sale of OHM's 540 acres at Remington Road in Delta and/or from my share of the the proceeds from the sale of Gate 21 hanger at Fairbanks International Airport, I will personally see that money due is paid before this year is up. Based upon this assurance I am relying on your word that no litigation will be filed.

> [*] $64,950.64   (original purchase)
> −5,000.00   (pd. on acct. 5/19/78)
> $59,950.64   (still owing, interest not included)

Underwood's counsel subsequently wrote Merdes to clarify what Underwood sought in order to forestall litigation. The letter states in part:

> I have your letter dated January 29th, 1980 *wherein you agree to be personally responsible for the sum of $59,950.64.* Although it is Mr. Underwood's belief that you are responsible for the entire debt, he is willing to make the following concession based upon getting certain things cleaned up.

> It is easy to establish that the original sale was at $64,950.64. $5,000.00 was paid on account, leaving a balance due of $59,950.64 as of the last delivery on June 7th, 1978. Mr. Underwood calculates interest at the rate of 1% compounded monthly, starting June 7th, 1978....

... He would like a minimum of $1,000.00 per month to forestall litigation.

In addition, he would like a confession of judgment from the corporation for the sum of $72,426.84 including interest from 12/31/79 continuing at 1% per month, compounded monthly. He will agree not to execute, nor file any litigation against you personally provided he receives the sum of $1,000.00 per month.

[Emphasis added.] On March 15, 1980, Merdes responded:

The settlement terms you outlined are acceptable providing however, that interest on the judgment against the company is at the statutory legal rate.[1]

Enclosed is our personal check for $1,000.00 which represents the first payment commencing April 1980; the next payment will be made in May and $1,000.00 thereafter until the $59,950.64 [for] which I am personally responsible is paid off.

Commencing in March 1980, Merdes, personally began making $1,000 per month payments to the Parrish Law Office for Underwood. He paid $10,000 in 1980, $12,000 in each of the years from 1981 to 1983, and $3,000 in 1984. Merdes made a total of $49,000 in monthly payments toward the debt (although the last two checks, totalling $1,000 were not cashed). He stopped payments in March 1984 "[d]ue to an unexpected cash flow [problem] around tax time."

In May 1984, Underwood's counsel wrote to Merdes that Underwood would like to receive his full twelve payments each year and that "[w]e must also resolve the interest issue and get the paperwork finished." In September 1984, Underwood's counsel again wrote Merdes, asking Merdes to sign a promissory note with interest on the debt at 12% per year. Merdes declined to exe-cute the promissory note. Underwood then filed suit.

During the period in which Merdes made monthly payments to Underwood, Merdes and Underwood both used the same accounting firm, Interior Accounting Services, Inc. An Interior Accounting Services' employee, either Terry Burris or Lew Beyer, prepared Merdes' taxes for the years 1978 to 1984. Burris also prepared an amortization table regarding the Alaska Feed debt, for use in preparing Merdes' tax returns, which reflected 12% simple interest. Merdes took interest deductions in 1981 to 1984 that mirrored the interest shown on the amortization table.

In 1981, the Internal Revenue Service (IRS) audited Merdes' tax return. Underwood was requested to provide a letter indicating he received $12,000 in interest payments in 1981. Underwood provided the letter, which was subsequently furnished to the IRS as proof of interest payments in the Merdes audit.

Burris testified that, to the best of his recollection, he always handled the payments in question, both in the preparation of the amortization schedule and in the preparation of Merdes' return, consistent with Merdes paying interest to Underwood. Burris also testified that he was not aware of a specific agreement between Underwood and Merdes to pay interest. Likewise, Beyer had no specific recollection of whether Merdes or Underwood ever told him that Merdes agreed to pay interest on the debt. He testified that it may have been his idea to designate payments in the amortization table as interest, and that he recommended the debt be carried as interest on Merdes' tax return to save money and simplify the filing of tax returns, since reporting it as a personal debt of Merdes would eliminate the need for an OHM tax return.

---

1. Under Alaska Statute 09.30.070(a) "[t]he rate of interest on judgments and decrees for the payment of money is 10.5 percent a year...." Similarly, under Alaska Statute 45.45.010(a) "[t]he rate of interest in the state is 10.5 percent a year and no more on money after it is due...." Both statutes were amended in 1980 to increase the rate of interest from 8 percent to 10.5 percent and became effective only to judgments entered or actions filed after July 1, 1980. Ch. 107, §§ 1, 2, 4, 5, 6, SLA 1980. Thus, it is not clear whether in March of 1980, Merdes was referring to the 8 percent or 10.5 percent rate, or the statutory rate generally.

## II. PROCEEDINGS.

Both parties moved for partial summary judgment. Merdes contended that any oral agreement on his part to pay interest on the OHM debt was within the statute of frauds and therefore null and void, that no consideration existed to support his agreement to pay the debt, and that he never agreed to pay any interest on the OHM debt. Underwood disagreed on each of these points. The superior court granted summary judgment in favor of Underwood, concluding that there was no genuine issue of fact as to the following: (1) Alaska Feed delivered seed worth $64,950.64 to OHM; (2) $5,000 was paid and the original balance due was $59,950.64; (3) Merdes agreed to pay Underwood $59,950.64; and that (4) Merdes' agreement was supported by consideration. The superior court further concluded that "Merdes is estopped to deny that he agreed to pay $59,950.64 with simple interest at 12 per cent [sic] beginning with his first payment" and that the first payment was tendered March 15, 1980. Judgment was entered in favor of Underwood. This appeal and cross-appeal followed.

## III. DID THE SUPERIOR COURT ERR IN GRANTING SUMMARY JUDGMENT AGAINST MERDES?

Merdes contends that the superior court erred in entering summary judgment against him and that neither equitable estoppel nor quasi-estoppel provides a basis for its decision. "When reviewing a grant of summary judgment, this court 'must determine whether there was a genuine issue of material fact and whether the moving party was entitled to judgment on the law applicable to the established facts.'" *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985) (quoting *Brock v. Alaska Int'l Indus.*, 645 P.2d 188, 190 n. 6 (Alaska 1982)). All reasonable inferences of fact from proffered materials must be drawn against the moving party,

and in favor of the non-moving party. 699 P.2d at 1280. The party seeking summary judgment has the burden of proving that his opponent's case has no merit. *Riley v. Northern Commercial Co.*, 648 P.2d 961, 966 (Alaska 1982). Where there is a factual dispute, the non-moving party's version of the facts is assumed correct. *Mat-Su/Blackard/Stephan & Sons v. State*, 647 P.2d 1101, 1102 n. 1 (Alaska 1982) (citing *B–E–C–K Constructors v. State*, 604 P.2d 578, 581 n. 4 (Alaska 1979)).[2]

Merdes contends that statements contained in tax returns are not binding admissions, and that their accountants' tax strategy was known to Underwood and reflected at most a pragmatic way of reporting taxes. He further argues that the evidence offered showed no agreement on his part to pay interest, and that estoppel is not applicable because Underwood was not misled by the tax strategy. Underwood replies that the uncontroverted facts support the superior court's summary judgment ruling under a quasi-estoppel theory. He contends that it is unconscionable for Merdes now to assert that he did not agree to repay the Alaska Feed debt at simple 12% interest, because of Merdes' January 29, 1980 letter, his (Underwood's) forbearance from litigation and consequent deterioration of evidence, the preparation of the amortization table, Merdes' treatment of his payments for tax reporting purposes, Merdes' position that he made interest payments in the context of the tax audit, and Underwood's forbearance on his claim for compound interest.

The elements of equitable estoppel are the assertion of a position by conduct or words, reasonable reliance thereon by another party, and resulting prejudice. *Jamison v. Consolidated Utils.*, 576 P.2d 97, 102 (Alaska 1978). The core of the doctrine of quasi-estoppel is the existence of facts and circumstances making the previous assertion of a position inconsistent with the one now taken unconscionable.

---

2. Pursuant to Alaska R.Civ.P. 56, a court "may properly grant summary judgment on a ground other than that assigned in the motion, where it is clear there is no genuine issue of material fact." J. Moore, W. Taggart and J. Wicker, 6 Moore's Federal Practice, ¶ 56.14[1] at 56–354–55 (1986). If the superior court's decision was incorrect as a matter of law, this court may uphold the decision if there is any other ground which, as a matter of law, would support the result reached. *Carlson v. State*, 598 P.2d 969, 973 (Alaska 1979).

*Id.* at 102. We conclude that genuine issues of material fact exist as to whether the elements of equitable estoppel or quasi-estoppel have been met here, and therefore hold that the superior court erred in granting summary judgment against Merdes on estoppel grounds.

■ Viewing the evidence in the light most favorable to Merdes, we are of the opinion that genuine issues of fact remain concerning whether Underwood reasonably relied on and was thereby prejudiced by any representations on Merdes' part.[3] There is no indication in the record that Merdes represented to Underwood that he would repay the Alaska Feed debt at 12% simple interest. His correspondence to Underwood's attorney indicates disagreement on a specific interest term. Both of Merdes' accountants testified that they did not know whether there was a specific agreement to pay interest on the debt. As previously noted, Merdes wrote to Underwood's counsel indicating his acceptance of the settlement terms "providing however, that interest on the judgment against the company is at the statutory legal rate." Absent uncontroverted evidence of a representation by Merdes to Underwood that he agreed to pay the debt at 12% simple interest, there remains a genuine issue of fact as to whether Underwood reasonably relied upon Merdes' representations to the IRS. Prejudice or injustice cannot be established unless Underwood was misled.[4]

As to the application of the doctrine of quasi-estoppel here, we are of the further view that the presence of genuine issues of material fact precluded the superior court from grounding its result on this theory. As we stated in part in *Jamison:*

Among the many considerations which may indicate that an inconsistent statement is unconscionable and the doctrine of quasi-estoppel should be applied are whether the party asserting the inconsistent position has gained an advantage or produced some disadvantage through the first position; the magnitude of the inconsistency; [and] whether the inconsistency was relied on by the party claiming estoppel to his detriment....

576 P.2d at 102. Again, we find it significant that there has been no uncontroverted showing that an agreement to pay 12% interest on the OHM debt existed or that Underwood had been misled or relied on Merdes' representations to the IRS. While Underwood may have had knowledge of the 12% interest representation to the IRS, evidence also indicates that he may have known that this was not a complete representation as to an interest agreement on the Alaska Feed debt and therefore, may not have been disadvantaged by it. Further, the record indicates that Merdes could have deducted the debt payment as either principal or interest, and thus there has been no conclusive showing that Merdes gained any advantage by his assertion. Thus, tax simplification is a plausible and not unconscionable reason for the possible inconsistency of Merdes' representation to the IRS.

## IV. IS MERDES ENTITLED TO SUMMARY JUDGMENT ON THE INTEREST ISSUE?

■ Merdes asserts that Underwood should not have prevailed on the interest

---

**3.** Merdes has asserted, both through words and conduct, that at least $39,392 of the $49,000 in payments to Underwood was interest. Merdes reported that much as interest on his tax returns and filed those returns. In filing his returns, he appeared to follow an amortization table which calculated the interest at 12%. He made periodic monthly payments to Underwood which were the bases of these deductions.

**4.** Merdes also refers to the injustice of Underwood asserting estoppel against him for his assertions to the IRS, when Underwood made representations to the IRS by writing off the OHM debt. He argues that because Underwood knew of the tax strategy he should not be able to use estoppel as a theory of recovery.

Usually a person cannot claim the benefit of estoppel if he himself has acted unfairly. "[W]here the party complaining himself has 'unclean hands' basic fairness demands that he be estopped from the conduct he reasonably induced." *Alaska Limestone Corp. v. Hodel,* 614 F.Supp. 642, 647 (D.Alaska 1985). The fact that Underwood may have known of the tax strategy or written the debt off is not evidence of an inducement of Merdes, and therefore does not preclude him from asserting estoppel.

issue because he proffered no relevant evidence but merely relied on his pleadings. Underwood argues that the same admissible evidence which supports estoppel with regard to the interest issue also establishes a genuine issue of fact concerning the question of whether or not Merdes agreed to pay interest.

We agree with Underwood. Although sufficient facts have not been presented to warrant summary judgment against Merdes, if all reasonable inferences are drawn against Merdes as the moving party, the same evidence on which Underwood bases his estoppel argument raises genuine issues of material fact as to whether or not Merdes agreed to pay 12% simple interest.[5] Merdes followed the accountants' 12% amortization table in deducting his taxes. He deducted $39,392.00 of the payments he made to Underwood as interest. Further, Merdes made a specific agreement to pay the OHM debt, which is sufficiently ambiguous as to raise the possibility of an interest term.[6] Thus, we hold that there are disputed facts going to the issue of whether Merdes agreed to pay interest and whether he agreed to pay 12% simple interest.

## V. ANALYSIS ON REMAND.

On remand, the superior court should note that a debtor may be charged interest for the withholding of the amount due when that amount is ascertainable.[7] As put by the Restatement (Second) of Contracts § 354 (1981):

*Interest as Damages.*

(1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.

(2) In any other case, such interest may be allowed as justice requires on the amount that would have been just compensation had it been paid when performance was due.

Interest is a standardized form of compensation to the injured party for the loss of the use of what should have been paid. Restatement (Second) of Contracts § 354, comment a. "It is payable without compounding at the rate, commonly called the 'legal rate,' fixed by statute for this purpose." *Id.* "Interest is not payable as

---

**5.** To avoid summary judgment a respondent must present factual material and may not rely on general allegations. *Nizinski v. Golden Valley Elec. Ass'n,* 509 P.2d 280, 284 (Alaska 1973). However, reference to information on file before the trial court, including depositions, interrogatories, and admissions, is sufficient to bring its contents to the court's attention for purposes of disposing of the motion for summary judgment. *Bowers v. Alaska State Emp. Fed. Credit Union,* 670 P.2d 1145, 1146–47 (Alaska 1983).

**6.** The statement "interest not included" in Merdes' January 29, 1980, letter is ambiguous. It could mean either that interest was not included in his calculation of the amount he was guaranteeing Underwood, or that he intended to pay no interest. Such ambiguity should be resolved by the trier of fact utilizing extrinsic evidence. When confronted with a similar ambiguity in letters alleged to have created a contract, this court in *Zeman* stated in part:

Because the writings are ambiguous, interpreting them can best be achieved by considering them in light of what was said and promised.... Resorting to evidence extrinsic

to the letters can be helpful, similar to using extrinsic evidence to interpret ambiguous written contracts. Interpretation of these letters depends on knowledge of surrounding circumstances.... It presents a question of fact which should not have been resolved in a motion for summary judgment.

699 P.2d at 1281 (footnote omitted).

**7.** *Rogers Walla Walla, Inc. v. Willis Shaw Frozen Express, Inc.,* 23 Wash.App. 540, 596 P.2d 669, 673 (1979); *cf. National Bank of Alaska v. J.B.L. & K. of Alaska, Inc.,* 546 P.2d 579, 591 (Alaska 1976) (holding prejudgment interest to be awarded even where claims unliquidated); *State v. Phillips,* 470 P.2d 266, 274 (Alaska 1970) ("All damages then, whether liquidated or unliquidated, pecuniary or nonpecuniary, should carry interest from the time the cause of action accrues, unless for some reason peculiar to an individual case such an award of interest would do an injustice.") Interest is generally owing by the debtor from the date the debt is due or from the date the debtor refuses to pay. *Brownie's Army & Navy Store, Inc. v. E.J. Burke, Jr., Inc.,* 72 A.D.2d 171, 424 N.Y.S.2d 800, 803 (N.Y. App. Div.1980).

damages for non-performance until performance is due." *Id.*, comment b.[8]

The position of the Restatement and those courts which have held that interest may be charged on a sum certain due comports with our view in regard to awarding prejudgment interest and the purpose behind such awards. As stated in *Bevins v. Peoples Bank & Trust Co.*, 671 P.2d 875, 881 (Alaska 1983):

> The purpose of awarding prejudgment interest is not to penalize the losing party, but rather to compensate the successful claimant for losing the use of the money between the date he or she was entitled to it and the date of judgment. A corollary purpose is to prevent the judgment debtor from being unjustly enriched by the use of that money. *Farnsworth v. Steiner*, 638 P.2d 181, 184 (Alaska 1981); *Anchorage Asphalt Paving Co. v. Lewis*, 629 P.2d 65, 69 (Alaska 1981). Prejudgment interest should not be awarded, however, when it is unjust to do so. *Anchorage Asphalt*, 629 P.2d at 70.

Accordingly, the superior court should employ the following analysis on remand. If the court finds that there was an agreement not to pay interest on the debt, then Merdes is not liable for any interest. If it finds that there was no agreement not to

pay interest, then it must determine whether there was an agreement to pay 12% simple interest. If it further determines that there was no agreement to pay 12% simple interest, then it should impose the statutory rate of interest from the date it determines the debt was due.

## VI. WAS THE AGREEMENT TO REPAY THE ALASKA FEED DEBT, INCLUDING INTEREST, SUBJECT TO THE STATUTE OF FRAUDS?

Merdes argues that even if the court determines that there was an agreement to pay interest, the statute of frauds applies and his promise is therefore unenforceable under provisions requiring a writing where there is a special promise to answer for the debt of another.[9] Underwood argues that the statute of frauds is inapplicable because Merdes obtained independent consideration for the promise; that is, the withholding of suit. We agree with Underwood.[10]

▆▆▆▆ An agreement to pay the debt of another does not come within the statute of frauds where the surety promisor's "main purpose" or "leading object" is to benefit his own pecuniary or business position. *See generally* Restatement (Second) Contracts § 116 (1981).[11] Here the record dem-

---

8. "If there is a period of time before performance, such as a definite or indefinite period of credit, interest does not begin to run until the period is over. If the performance is to be rendered on demand, interest does not begin to run until a demand is made, even though an action might be maintained without a demand." Restatement (Second) of Contracts § 354, comment b.

9. AS 09.25.010(a) states in pertinent part:
   In the following cases and under the following conditions an agreement, promise, or undertaking is unenforceable unless it or some note or memorandum of it is in writing and subscribed by the party charged or by an agent of that party:
   ....
   (3) a special promise to answer for the debt of another;
   ....

10. The issue of the applicability of the statute of frauds is only implicated if there was an agreement to pay 12% simple interest. As noted above, if there was an agreement not to pay interest no interest is due; otherwise, the law

requires that the statutory or legal rate of interest be charged on the sum certain due, regardless of whether there was agreement to pay interest.

11. "It is well settled that whenever the leading and main object is not to become surety or guarantor of another but to subserve some purpose or interest of his own, the promise is not within the statute [of frauds] even though performance of the promise may pay the debt or discharge the obligation of another." *Farr & Stone Ins. Brokers, Inc. v. Lopez*, 61 Cal.App.3d 618, 132 Cal.Rptr. 641, 642 (1976) (quoting *Merit v. J.A. Stafford Co.*, 68 Cal.2d 619, 68 Cal. Rptr. 447, 440 P.2d 927, 932 (1968)). "[T]he important question is whether the promise is only an assumption of another's liability or a new and primary obligation of the promisor." *Id.* 132 Cal.Rptr. at 643. A party's concern for his own business reputation is sufficient to take a promise out of the statute. *Cf. id.* 132 Cal. Rptr. at 642 (personal concern of a party for welfare of his children, their economic venture, and his own business reputation sufficed to take his promise outside of the statute).

onstrates that the agreement to pay the debt was given for Merdes' own business advantage. It served the function of forestalling litigation against OHM, a corporation in which the Merdes were initially 80% shareholders and later became 100% shareholders, as well as benefitting his "credit reputation." [12]

The judgment of the superior court is REVERSED and REMANDED for further proceedings.[13]

MATTHEWS, J., dissents.

MATTHEWS, Justice, dissenting.

I agree that the superior court erred in entering summary judgment against Merdes on equitable estoppel or on quasi-estoppel grounds. I differ with the majority in the resolution of those issues, however. As to estoppel, Underwood has not shown that he detrimentally relied on Merdes' representations to the I.R.S., which indicated that Merdes was repaying the debt with interest. Absent a showing of detrimental reliance, no estoppel will lie. *See Jamison v. Consolidated Utilities*, 576 P.2d 97, 102 (Alaska 1978). As to quasi-estoppel, Underwood has not shown that Merdes either gained an advantage or produced a disadvantage through his representations to the I.R.S. Merdes claims that as a business taxpayer, all of his payments, whether in principal or in interest, were tax deductible, and this claim is not contested by Underwood.

I also agree with the framing of the question on the merits in the majority opinion. The relevant question is whether there was agreement that Merdes would not pay interest in the future on the sum

that he agreed to repay, $59,950.64. However, in my view no evidence has been presented which points to such an agreement. Merdes' letter of January 29, 1980, which contains the notation "still owing, interest not included," is an offer by Merdes to pay the $59,950.64 principal amount which his company owed, but not the interest which had accrued on or before December 31, 1980. On February 14, 1980 Underwood's counsel accepted Merdes promise to assume personal responsibility for only $59,950.64, relieving him of liability for an alleged $12,476.68 in past due interest. Counsel also countered the payment term with the offer that Merdes would begin to repay the sum owed at $1,000 per month. Merdes' response on March 15, 1980 accepted this counteroffer and he began making $1,000 payments at that time. Thus the agreement between the parties was that Merdes would pay the sum of $59,950.64 in installments of $1,000 per month. The agreement was made, and the debt became due, on March 15, 1980 because that is when Underwood's counteroffer was accepted by Merdes. The agreement did not contain any terms protecting Merdes from paying future interest, on and after March 15, 1980, on the sum that he had agreed to pay.

Under the rule set forth in the majority opinion, interest runs on a debt from the date that the debt becomes due, unless the parties otherwise agree. In this case the parties do not contend that their contract consists of writings other than the three letters mentioned, or of any conversations. In such circumstances, the meaning of the writings which constitute the contract is a question for the court which is appropriate

---

12. Even assuming the agreement was within the statute of frauds, Merdes' January 19, 1980 letter agreeing to personally pay the Alaska Feed-OHM debt would be sufficient as a memorandum to satisfy the statute of frauds. *See Fleckenstein v. Faccio*, 619 P.2d 1016, 1020 (Alaska 1980) (finding a writing to be sufficient, even if not formal or complete, as long as there is no serious possibility of consummating a fraud by enforcement).

Thus, although this agreement to pay the debt satisfies the statute of frauds, its ambiguity in regard to the interest issue, as mentioned previously, necessitates extrinsic evidence to estab-

lish the meaning of the writing. *Cf. Alyeska Pipeline Serv. Co. v. O'Kelley*, 645 P.2d 767, 771 n. 1 (Alaska 1982) (holding a court may initially turn to extrinsic evidence in construing a contract).

13. On cross-appeal Underwood argues that the superior court erred by establishing the date for the accrual of interest as March 15, 1980. Given our dispositions of the equitable estoppel, quasi-estoppel, and promise to pay interest issues, this issue must have its resolution on remand.

for resolution on summary judgment. *Peterson v. Wirum*, 625 P.2d 866, 870 (Alaska 1981). The only reasonable interpretation of the writings, in my view, is that there was no agreement not to pay interest after March 15 on the principal sum. Thus, Underwood was entitled to summary judgment awarding him interest from the date that the debt became due, on the basis of the parties' contract.

Underwood, however, was not entitled to interest at the rate of 12%, as he claims. The writings which constitute the contract are before us and they clearly show that there was no agreement on the part of Merdes to pay 12% interest.[1] Under such circumstances, the statutory rate of interest, 8% as of March 15, 1980, should be imposed. AS 09.30.070, ch. 107, § 1, SLA 1980; AS 45.45.010(a), ch. 107, § 2, SLA 1980.

For the above reasons I would reverse the judgment of the superior court and remand this case with instructions for the entry of judgment in a sum which reflects Merdes' obligation to pay the sum of $59,-950.64, with interest at the rate of 8% accruing from and after March 15, 1980.

---

1. Merdes declined Underwood's offer to have the corporation confess judgment at the rate of 12% interest, insisting on interest at the lower statutory rate. It seems highly improbable that Merdes would assume personal responsibility for interest at the rate of 12%, when the corporation was liable for less. Furthermore, neither party has testified that Merdes promised to pay 12% interest on the debt.